Terrance P. HAHN and Barbara Hahn

v.

ATLANTIC RICHFIELD CO., a Pennsylvania corporation and John Doe # 1, Eaton Corporation, Manufacturer and/or Supplier of the crane, and/or safety hook, and/or rigging and John Doe # 2, Crane Rental Company and Fluor Engineers & Constructors, Third and Price Streets, Marcus Hook, Pennsylvania Eaton Corporation, Appellants.

No. 79–2156.

United States Court of Appeals, Third Circuit.

Argued April 22, 1980.

Decided July 3, 1980.

John J. O'Brien, Jr. (argued), O'Brien & O'Brien, Philadelphia, Pa., for appellants.

E. Harris Baum (argued), Norman P. Zarwin (argued), Edward J. Ross, Donald J. Richmond, Philadelphia, Pa., for appellees.

Before ALDISERT, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The appeal in this diversity case tried under Pennsylvania law requires us to de-

cide whether the district court erred by refusing to enter judgment notwithstanding the verdict in favor of a manufacturer of a defective chain hoist that the jury found to have caused appellee's injuries. On December 14, 1972, appellee Terrance P. Hahn, an employee of Fluor Engineers and Contractors, was severely injured while working as a pipefitter at the Atlantic Richfield Company refinery in Philadelphia, Pennsylvania, when a 600-pound pipe suspended overhead by a Yale One Ton chain hoist fell on him. A jury found Eaton Corporation, the manufacturer of Yale hoists, liable for breach of warranty under the Pennsylvania Uniform Commercial Code for selling the defective hoist to Fluor, and awarded $1,050,000 to Hahn and his wife as damages for the breach. Because we conclude that the evidence at trial was insufficient as a matter of law to prove a sale of the hoist, a predicate of any warranty action under Article 2 of the Code, we reverse the judgment of the district court.

## I.

Approximately two years after the accident, on November 30, 1974, Hahn and his wife filed a complaint in the Eastern District of Pennsylvania alleging negligence against several defendants: Atlantic Richfield, on whose property the accident occurred, Fluor Engineers, Hahn's employer, and, as a John Doe defendant, the manufacturer of the chain hoist. Because the hoist could not be located after the accident, Hahn asserted that he was unable to identify the manufacturer.[1] On June 30, 1976, the complaint was amended to substitute Eaton Corporation, the manufacturer of Yale hoists, as defendant. Eaton's answer

to the complaint raised the defense that the action was barred by the Pennsylvania statute of limitations for personal injuries because Eaton had not been named as a defendant until more than two years had expired since the date of the injury.[2] Thereafter, on March 17, 1977, Hahn again amended his complaint to proceed against Eaton under Article 2 of the Uniform Commercial Code on the theory of breach of warranty of merchantability and fitness for a particular purpose. The amended complaint alleged that at the time Eaton sold the hoist to Fluor it contained a latent defect. No date of sale was averred, however. The district court ruled that the March 17 amendment related back to the June 30, 1976 amendment and concluded that the Code's four year limitations period of Article 2 would not bar Hahn's claim unless Eaton could show that it sold the hoist to Fluor more than four years before June 30, 1976, the date Eaton was joined as a party.[3]

At trial, Hahn introduced opinion testimony of several eye witnesses to show how the accident had happened. In addition, testimony of two other pipefitters who were working with Hahn on the day of the accident was introduced to show that the hoist in question was a Yale One Ton hoist and that it was "new." See Appendix at 413a, 427a–28a. The hoist itself, however, was never introduced into evidence because it could not be located after the accident.[4] Hahn introduced no direct proof of sale. Instead, counsel read to the jury answers to certain interrogatories and requests for admissions by Eaton and Fluor showing that Eaton had manufactured a Yale One Ton

---

1. Also named as defendant in the original complaint was John Doe No. 2, an alleged rental company of the hoist. On May 25, 1978, John Doe No. 2 was dropped as a defendant. On the same date, a directed verdict was entered in favor of defendant Atlantic Richfield. No appeal has been taken from that order.

2. Under Pennsylvania law, suits brought to recover damages for non-fatal personal injuries must be brought within two years from the date of injury. See 12 P.S. § 34 (repealed 1978)

(current version at 42 Pa.C.S. § 5524(2), effective June 27, 1978).

3. See U.C.C. § 2–725, 12A P.S. § 2–725, set forth in note 8 infra. See also 42 Pa.C.S. § 5525(2).

4. Notwithstanding exhaustive efforts by counsel for Hahn, as well as by counsel for Eaton, Fluor, and Atlantic Richfield, to ascertain the whereabouts of the hoist, it was never recovered. See Brief for Appellees at 1.

chain hoist in 1971 or 1972 and that Fluor had supplied to the worksite the hoist involved in the accident.[5] Counsel for Eaton offered into evidence Exhibit DE–1, which was an agreement dated December 15, 1971 between Atlantic Richfield and Fluor that governed the work Fluor was performing at the refinery. Among the listed equipment that Fluor was responsible for supplying pursuant to the agreement was a single one ton hoist.

At the close of trial, Eaton moved for directed verdict on the ground that Hahn had not established proof of sale of the hoist from Eaton to Fluor. The motion was denied. The jury returned a verdict in favor of Hahn and against Eaton on the issue of liability. Thereafter, in an unpublished opinion of June 20, 1979, the district court denied Eaton's post trial motion for judgment notwithstanding the verdict. This appeal by Eaton followed.

5. The following is the verbatim text of what counsel read to the jury.

Q *Did your company [Eaton] in 1971 or 1972 manufacture a One Ton Yale Chain Hoist?*

A Yes, but we have no knowledge that a Yale One Ton Chain Hoist was involved in the accident which is the subject of this lawsuit.

Q If your company is not the distributor of such machine, state the name and the address of the distributor in 1971 and in 1972.

A Eaton Corporation. There were different independent distributors of Yale Hoist[s] during 1971 and 1972. Our marketing department does not have records showing exactly who they were during these years.

The following admissions, if it please Your Honor, and the jury, are by Fluor Engineers and Constructors.

Q That the chain hoist involved in the accident which occurred on December 14, 1972, was owned and in the exclusive control and possession of defendant Fluor Constructors and Engineers by its agents, servants or workmen within the course and scope of their employment.

The answer to that question by Fluor is as follows:

The defendant Fluor Engineers and Constructors did supply the chain hoist involved in the accident which occurred on December 14, 1972. The details of ownership and control are not known and are therefore denied.

App. at 438a–39a.

## II.

Eaton raises two arguments that merit our consideration. First, it argues that because this case was tried under the warranty provisions of Article 2 of the UCC, the sales article of the Code, the district court erred by submitting to the jury the issue of whether the chain hoist was defective at the time of sale in the absence of any evidence that Eaton actually sold the hoist to Fluor.[6] Appellee Hahn, while conceding that to recover for breach of warranty under the Code he must first show that a sale of the hoist from Eaton to Fluor was consummated, *see* Brief for Appellees at 20–21; *see also* U.C.C. §§ 2–102, –106; *DeMatteo v. White*, 233 Pa.Super. 339, 336 A.2d 355 (1975), nonetheless contends that the record contains ample evidence from which the jury could properly have inferred that such a sale did in fact take place.

The standards that govern our review of this evidentiary issue are familiar.

6. The following special interrogatories were answered by the jury.

1. Did a malfunction of the hoist cause the accident?

Ans: Yes

2. Was the hoist manufactured by Eaton?

Ans: Yes

3. When was the hoist sold by Eaton?
(a) Before June 30, 1972 _____
(b) After June 30, 1972 _____
(c) Unable to determine when
it was sold. ___X___

4. At the time the hoist was sold by Eaton was there a breach of warranty; the express warranty that it was capable of lifting up to one ton of weight; the implied warranty of merchantability?

Ans: Yes

5. Was the accident caused by the condition or characteristic of the hoist which constituted the breach of warranty?

Ans: Yes

6. Was negligence on the part of the Fluor Company, plaintiff's employer, a cause of the malfunction of the hoist?

Ans: No

App. at 576a–77a, 591a. Counsel for Eaton objected to interrogatory No. 3 on the ground that it presumed a sale of the hoist by Eaton to Fluor. *See* App. at 516a.

A jury verdict carries with it the benefit of all reasonable inferences capable of being drawn therefrom, and an appellate court is bound to interpret the evidence in the light most favorable to the verdict winner. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962); *Kademenos v. Equitable Life Assurance Society*, 513 F.2d 1073, 1074 (3d Cir. 1975); *Thomas v. E. J. Korvette, Inc.*, 476 F.2d 471, 474 (3d Cir. 1973). Any fact that the jury could have reasonably inferred from the evidence in favor of the verdict winner will be presumed to have been so inferred when the court reviews the record supporting the verdict. If, however, the record discloses that the evidence on which the verdict is based is so critically deficient of proof of an essential fact needed to support the verdict that the jury could only have ventured a guess about its occurrence, then a judgment notwithstanding the verdict is required. *Denneny v. Siegel*, 407 F.2d 433, 442 (3d Cir. 1969); *see Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 n.5 (3d Cir. 1970).

█ Applying these precepts to the case at hand, we are left with the conclusion that Eaton is entitled to judgment notwithstanding the verdict. Proof of sale from Eaton to Fluor was an essential fact necessary to support the jury's verdict. The record evidence, however, even when interpreted most liberally in favor of Hahn, does not support the inference that a sale of the hoist from Eaton to Fluor was consummated. The jury could only have speculated about the occurrence of a sale. The evidence shows that Eaton manufactured and sold Yale One Ton hoists in 1971 or 1972; that the contract between Fluor and Atlantic Richfield called for a one ton hoist to be used by Fluor in performing work at the refinery; that Fluor supplied the hoist involved in the accident; and that the defective hoist was a Yale hoist and was "new" on the date of the accident. None of this evidence, however, tends to show, even re-

motely, how Fluor came to possess the hoist. It is possible that the hoist may have been obtained by lease, or by bailment; the rental of specialized equipment or machinery to contractors is commonplace.[7] The hoist may have been purchased as part of a bulk transfer. It may have been found by, or even given to Fluor. Or, as the jury inferred, it may have been purchased by Fluor from Eaton. Although all of these are conceivable possibilities, none of them can be properly inferred from the evidence presented at trial. There is simply no evidence, either direct or circumstantial, that would indicate how Fluor came to possess the hoist. We are left with no other determination but that the jury ventured a guess that the defective hoist was purchased by Fluor from Eaton. We conclude, therefore, that the record is legally insufficient to support a verdict in favor of Hahn because it lacks that "minimum quantum of evidence from which a jury might reasonably afford relief." *Denneny v. Siegel*, 407 F.2d at 439.

Appellees argue that they made all possible attempts to uncover information regarding a sale of the hoist. They contend that for this court to rule that they failed to sustain their burden of proof on this issue would be manifestly unjust because any information concerning a sale of the hoist should have been in the business records of either Eaton or Fluor. Appellees would have us conclude that liability for Mr. Hahn's injuries should not be avoided by Eaton simply because neither company's records satisfied their counsel's inquiries.

We will not accept this argument. That counsel could not uncover information of sale, presumably even though employing the liberal discovery procedures allowed by the Federal Rules of Civil Procedure, *see* Fed.R.Civ.P. 26, 34, indicates that documentary evidence of a sale to Fluor probably did not exist. We recognize that under certain circumstances a court may demand

---

7. *See, e. g.*, Greater Pittsburgh Business Industrial Yellow Pages 621–24 (1979). We have previously noted appellees' alternative theory in their original complaint alleging that John Doe No. 2, Crane Rental Company, had leased the hoist and was responsible for Hahn's injuries. *See* note 1 *supra*.

production of evidence from a party not having the ultimate burden of persuasion, and then draw a negative inference from that party's non-production. *See generally* 9 J. Wigmore, Evidence § 2486 (3rd ed. 1940). But absent evidence of a close relationship between Eaton and Fluor, we will not allow the verdict against Eaton to stand on an unfavorable inference drawn from Fluor's inability to document its possessory interest in the hoist. Nor will we draw such an inference from the unexplained disappearance of the defective hoist after the accident. While this amounted to an unfortunate development for appellees, we are not willing to penalize Eaton because of the loss, especially when Eaton had no knowledge of the accident until almost four years after its occurrence, and in light of the representation to this court by counsel for appellees that counsel for all parties to this litigation diligently, albeit unsuccessfully, attempted to locate the hoist. *See note 4 supra.*

We therefore conclude that the district court erred by not granting Eaton's motion for judgment notwithstanding the verdict.

### III.

█ Even were we to decide that Hahn satisfied his burden of proof on the sale issue, we would be inclined to overturn the judgment of the district court based on appellant's second argument, that the applicable statute of limitations barred this suit.

As previously stated, the accident occurred on December 14, 1972. The law suit, initially sounding in negligence, was instituted on November 12, 1974, but Eaton was not substituted as a defendant until June 30, 1976, more than three and one-half years after the accident. Because Pennsylvania law requires that personal injury claims be brought within two years of the date of injury, *see* note 2 *supra*, the complaint was amended on March 17, 1977, to allege breach of warranty under the UCC. The district court ruled that this latter amendment related back to June 30, 1976, for purposes of determining whether the suit was timely filed, and ruled further that because the complaint against Eaton now alleged breach of warranty under the UCC, the four-year provision of UCC § 2–725 would apply.[8] The court concluded that the suit was not barred because Eaton failed to shoulder its burden of proving that the sale to Fluor occurred more than four years before Eaton was entered as a party. Although we agree with the district court that the running of the statutory time period is an affirmative defense to be raised and proved by the defendant, we disagree that the UCC four-year provision would control this action. We predict, and when a federal court applies state law in a diversity case it is just that, a prediction, *see Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1286 (3d Cir. 1979) (in banc) (Statement of Aldisert, J.), that the Supreme Court of Pennsylvania, if faced with the factual complex of this case, would hold the two-year statute for personal injuries applicable to this suit.

---

**8.** Section 2–725, 12A P.S. § 2–725, provides:
§ 2–725. Statute of Limitations in Contracts for Sale

(1) An *action for breach of any contract* for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

(3) Where an action commenced within the time limited by subsection (1) is so terminated as to leave available a remedy by another action for the same breach such other action may be commenced after the expiration of the time limited and within six months after the termination of the first action unless the termination resulted from voluntary discontinuance or from dismissal for failure or neglect to prosecute.

(4) This section does not alter the law on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this Act becomes effective.

## A.

An examination of several Supreme Court of Pennsylvania decisions is critical to our analysis. In *Gardiner v. Philadelphia Gas Works*, 413 Pa. 415, 197 A.2d 612 (1964), plaintiffs instituted a breach of warranty action based on their contract for the purchase of gas from the Gas Works. The complaint alleged that the Gas Works warranted that the gas would be transmitted to the Gardiners in a safe manner, and that the Gardiners sustained personal injuries as a result of the Gas Work's failure to prevent gas from leaking into their home. The action was filed two years and eight days after the injury and the court of common pleas granted defendant's motion to dismiss the complaint on the ground that the action was barred by the two-year statute of limitations. On appeal, the supreme court reversed, holding that the four-year limitation period of UCC § 2–725 applied, and therefore that the action was not barred.

In reaching this result, the court reasoned that section 10–103 of the Code, 12A P.S. § 10–103, which provides that "all acts and parts of acts are repealed in so far as they are inconsistent herewith," indicates that UCC § 2–725 operates to repeal the limitations statute for personal injuries, 12 P.S. § 34, insofar as the latter applied to contract actions for personal injuries arising from breach of warranty. 413 Pa. at 418, 197 A.2d at 613. The court also based its decision on the general policies underlying the Code, noting that § 2–715 expressly permits consequential damages for personal injuries proximately resulting from any breach of warranty. *See* UCC § 2–715(2)(b). In addition, the court relied on § 1–102, which directs liberal construction of the Code in order to promote simplification and modernization of the rules governing commercial transactions, as well as to promote uniformity of the law among the various jurisdictions. The court concluded that one of the main purposes of the limitation statute under the Code was to introduce a uniform statute for all sales contracts regardless of whether the damages sought were for personal injuries or otherwise. 413 Pa. at 418–20, 197 A.2d at 613–

14. Concerning the effect its holding would have on tort actions for personal injuries, the court stated:

> In this Commonwealth we have always recognized that a personal injury claim based upon a breach of warranty is a distinct claim from a personal injury claim based on negligence. . . . Under such circumstances, a holding that Section 2–725 controls in this instant situation will effect no change in the substantive law of the Commonwealth.

*Id.* at 419, 197 A.2d at 614.

In *Rufo v. Bastian-Blessing Co.*, 417 Pa. 107, 207 A.2d 823 (1965), the court was faced with deciding from what date the four-year period of § 2–725 should be measured to determine if a purchaser's suit for breach of warranty under the Code was barred. Plaintiff filed his action on July 12, 1960, after being injured on December 8, 1957, when gas escaped from a defective valve on a portable liquid gas cylinder and caught fire. Rufo had purchased the cylinder in March 1956, more than four years before the filing of his complaint. The trial court dismissed the action.

In affirming the dismissal of the complaint, the Supreme Court of Pennsylvania concluded that actions brought under the Code to recover consequential damages arising from a breach of an implied warranty must be commenced within four years of the time when tender of delivery of the defective product is made, and not within four years of when the injury occurred. 417 Pa. at 113, 207 A.2d at 826. The court based this determination on the explicit wording of § 2–725, which states in part that "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made." *See* note 8 *supra*.

*Gardiner* and *Rufo* were decided before the seminal decision of *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), in which Pennsylvania adopted § 402A of the Restatement (Second) of Torts. Both cases involved actions for consequential damages

for personal injuries brought by plaintiffs who were in privity of contract with the seller of the defective products. At the time when those cases were decided, privity of contract—both vertical and horizontal—was required by Pennsylvania law as an element of a warranty action under the UCC. *See Miller v. Preitz*, 422 Pa. 383, 221 A.2d 320 (1966); *Hochgertel v. Canada Dry Corp.*, 409 Pa. 610, 187 A.2d 575 (1963). Privity was being retained under the Code even though the court was simultaneously expanding manufacturer liability under the concept of strict liability in tort. *See Webb v. Zern.*

This anomaly did not last long, however, for within two years of *Webb v. Zern*, the attack on the formalistic requirement of privity had begun. In *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848 (1968), the court abolished the need to allege vertical privity in implied warranty cases under the Code, thereby overruling *Miller v. Preitz.* Speaking through Justice Roberts, the court reasoned that the caption on the complaint in a products liability case should not produce a different result from an otherwise identical case simply because the action is brought in assumpsit instead of trespass. At least with respect to the privity issue, the court continued, the UCC must be coextensive with § 402A of the Restatement. 432 Pa. at 231, 246 A.2d at 854. Justice Roberts stated:

> We realize that prior to the adoption of section 402a of the Restatement of Torts by this Court, . . . a rather compelling argument against discarding privity in assumpsit actions for breach of warranty existed. Under the Uniform Commercial Code, once a breach of warranty has been shown, the defendant's liability, assuming of course the presence of proximate cause and damages, is absolute. Lack of negligence on the seller's part is no defense. Therefore, prior to the adoption of section 402a, it could be said that to dispense with privity would be to

allow recovery in contract without proof of negligence, while requiring a showing of negligence in order to recover for the same wrong against the same defendant if suit were brought in tort. To permit the result of a lawsuit to depend solely on the caption atop plaintiff's complaint is not now, and has never been, a sound resolution of identical controversies.

> However, with Pennsylvania's adoption of Restatement 402a, the same demands of legal symmetry which once supported privity now destroy it. Under the Restatement, if an action be commenced in tort by a purchaser of a defective product against a remote manufacturer, recovery may be had without a showing of negligence, and without a showing of privity, for any damage inflicted upon the person or property of the plaintiff as a result of this defective product.

432 Pa. at 228–29, 246 A.2d at 853–54.

This approach was extended in *Salvador v. Atlantic Steel Boiler Co.*, 457 Pa. 24, 319 A.2d 903 (1974) (*Salvador I*), a case factually similar to the case at hand, in which the supreme court abolished the requirement of horizontal privity in breach of warranty cases. Salvador, an employee of a company that purchased a boiler from the defendant, suffered severe bilateral hearing loss when the boiler exploded near his work station. Because Salvador was not considered to be in horizontal privity with the purchaser of the boiler, the trial court dismissed his complaint. The superior court reversed, 224 Pa.Super. 377, 307 A.2d 398 (1973), and the supreme court affirmed, overruling *Hochgertel v. Canada Dry Corp.,* 409 Pa. 610, 187 A.2d 575 (1963).[9] In so doing, the court relied heavily on its opinions in *Webb v. Zern* and *Kassab v. Central Soya*, once more reiterating a concern that the same result be reached in a law suit alleging product defect irrespective of whether the action is brought in trespass or assumpsit. Speaking again through Justice Roberts, the court stated:

---

**9.** Salvador's complaint alleged two counts, one in trespass based on 402A strict liability, and the other in assumpsit based on warranty theory. Although defendant had raised the defense

of the statute of limitations, the supreme court did not have that question before it on appeal. *See* 457 Pa. at 26, n.2, 319 A.2d at 904, n.2.

Today, as the Superior Court correctly recognized, a manufacturer by virtue of section 402A is effectively the guarantor of his products' safety. See *Webb v. Zern*, supra; *Kassab v. Central Soya*, supra. Our courts have determined that a manufacturer by marketing and advertising his product impliedly represents that it is safe for its intended use. We have decided that no current societal interest is served by permitting the manufacturer to place a defective article in the stream of commerce and then to avoid responsibility for damages caused by the defect. He may not preclude an injured plaintiff's recovery by forcing him to prove negligence in the manufacturing process. *Webb v. Zern*. Neither may the manufacturer defeat the claim by arguing that the purchaser has no contractual relation to him. *Kassab v. Central Soya*. Why then should the mere fact that the injured party is not himself the purchaser deny recovery?

Because the manufacturer is now a guarantor, the "harsh and unjust result" is worked on the plaintiff who may recover for his injury or loss if his complaint is in trespass, but on identical facts would be denied relief if the pleading is captioned "Complaint in Assumpsit." See *Kassab*, supra at 229, 246 A.2d at 853. This anomalous situation is certainly to be avoided. Thus "[w]ith Pennsylvania's adoption of Restatement 402a, the same demands of legal symmetry which once supported privity now destroy it." Id. 457 Pa. at 32–33, 319 A.2d at 907–08 (footnote omitted). By removing the last indicium of privity, the court in *Salvador I* made recovery for all non-purchaser claimants under the Code coextensive with recovery that would be afforded under 402A. With this in mind, we turn to deciding which limitations period is most compatible with this approach.

### B.

Determining which Pennsylvania statute of limitations should apply to non-purchaser warranty actions for personal injury is not an easy task. The difficulty arises because each of the theories of liability that have developed—strict liability in tort and liability for breach of warranty under the UCC—may be considered to call for the application of a different statute. The problem is compounded by the fact that the doctrine of strict liability grew simultaneously from contract and tort theories, and as a consequence, contract and tort law have been somewhat confused in this area.

■ It is now generally accepted, however, that the concept of implying a warranty to extend liability to the manufacturer of a defective product has been, from the outset, only a rather transparent device to accomplish the desired result of strict liability. *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 377 P.2d 897, 27 Cal.Rptr. 697 (1963); *see also* Restatement (Second) of Torts § 402A, comment m (1965); Prosser, *The Fall of the Citadel*, 50 Minn.L.Rev. 791, 802 (1966). Although strict liability of a manufacturer to a person not in privity has been based on the theory of a warranty running with a product to the injured plaintiff, the abandonment of the requirement of a contract between the parties involves a recognition that liability is not assumed by any contract agreement but is imposed by law. As Dean Prosser has stated, implied warranty is

> a freak hybrid born of the illicit intercourse of tort and contract. "A more notable example of legal miscegenation could hardly be cited than that which produced the modern action for breach of warranty. Originally sounding in tort, yet arising out of the warrantor's consent to be bound, it later ceased necessarily to be consensual, and at the same time came to lie mainly in contract."

Prosser, *Assault upon the Citadel*, 69 Yale L.J. 1099, 1126 (1960) (footnotes omitted).

■ There exists, however, a fundamental difference between tort and contract. That difference lies in the nature of the particular interest protected. Tort law is predicated on social policy that protects a plaintiff, as a member of a class of people to whom a duty is owed, in his interest to

be free from unreasonable risks of injury. This interest is protected by imposing on the defendant as a matter of law a duty to perform to a certain standard of conduct. *See Bradshaw v. Rawlings,* 612 F.2d 135, 138–41 (3d Cir. 1979). If injury occurs, tort law attempts to place the injured party in the same position he occupied before the injury.

 By contrast, contract law protects the expectation interests of contracting parties based on a voluntary agreement that defines their relationship. Protection is limited to those individuals specifically named in the contract, and enforcement is based on the manifestation of intent between the parties. Only rarely will the power of the parties to effect their desires be inhibited. If breach occurs, contract law seeks to give to the non-breaching party the benefit of his bargain, to put him in the position he would have been in had there been no breach. *See generally,* W. Prosser, Law of Torts, § 93, at 634–43 (3d ed. 1964); Wade, *Section 402A and the UCC,* 42 Tenn. L.Rev. 123 (1974).

 In evaluating these different interests, the Supreme Court of Pennsylvania has been moving in the direction of viewing non-purchaser actions filed under the UCC as strict liability actions in tort, rather than as contract actions. *See Kassab v. Central Soya,* 432 Pa. at 227–35, 246 A.2d at 852–55; *Salvador v. Atlantic Steel Co.,* 457 Pa. at 26–33, 319 A.2d at 906–08. It follows, then that products liability cases in Pennsylvania would be controlled by the personal injury statute of limitations, rather than the contract provision of UCC § 2–725, because the supreme court is extending liability in this area, based not on the contractual intent of the manufacturer, but purely as a matter of social policy. Liability is being imposed to protect the interest in freedom from injury to the person. We therefore predict that the statute of limitations specifically designed by the legislature to offer a defendant repose after two years from when he

invaded that interest is the statute of limitation that the Pennsylvania court would apply to these actions.

*Kassab* and *Salvador I,* the most recent pronouncements of the supreme court in this area, are strong evidence that the *Gardiner* and *Rufo* decisions would not be extended to control Hahn's claim of breach of implied warranty. Both *Gardiner* and *Rufo* involved direct contract actions for consequential damages brought by purchasers of the defective goods. Even if *Gardiner* were correct that the Pennsylvania legislature intended to preempt the tort limitations statute as it related to buyers actions for product defect, this would not mean that the same intent applied to actions by non-purchasers for breach of implied warranty.[10] Furthermore, the rationale underlying *Kassab,* that the resolution of identical controversies should not depend on the caption atop the complaint, does not support an approach requiring that § 2–725 be applied to this action.

In his analysis of the *Gardiner-Rufo* rule, John E. Murray, Jr., Dean of the University of Pittsburgh School of Law, advances two independent reasons why § 2–725 should not apply to personal injury actions brought by non-purchaser claimants. Murray, *Products Liability—Another Word,* 35 U.Pitt.L. Rev. 255 (1973). His first reason is based on a literal interpretation of the terms of § 2–725, in which he shows that the section does not extend to non-contracting parties.

There is no mention of personal injury actions or, for that matter, third party beneficiary actions, in Section 2–725 or the comments thereto. The section is entitled, "Statute of Limitations in Contracts for Sale." The entire section is directed toward the typical buyer of goods in the typical commercial transaction. It requires an action to be commenced within four years after the cause of action has accrued. A cause of action accrues when the breach occurs, regardless of the aggrieved party's knowledge

---

**10.** That such a result was contemplated by the legislature is highly unlikely. *See* Murray, *Products Liability—Another Word,* 35 Pitt.L.

Rev. 255, 264–66 (1973). *See also* Wade, *402A and the UCC,* 42 Tenn.L.Rev. 123, 130–41 (1974) (UCC does not preempt tort liability).

of the breach. The Code then proceeds to clarify the precise time when a breach of warranty occurs and that is when tender of delivery is made. Since "delivery" is made only to the buyer, it can only be relevant to the buyers to commence the statutory period. If there is a breach of warranty upon delivery in that the goods are non-conforming, only the buyer has a cause of action at that time. The only legal relationship existing at that time is between buyer and seller. If this interpretation needs buttressing, it is found in the section itself which indicates that the cause of action accrues when the breach occurs, "regardless of the aggrieved party's lack of knowledge of the breach." But, who is an "aggrieved party"? There is no doubt on this score since the Code defines "aggrieved party" as any party entitled to a remedy. At the time of delivery, which is when the limitations period commences, the only possible aggrieved party is the buyer and, therefore, the buyer is the only party entitled to a remedy at that time.

Under this analysis the conclusion is inescapable that the section is designed to apply a four-year period to the typical commercial buyer commencing at the time the buyer takes delivery. A comment to the section reinforces this exclusive focus, stating that, "[t]his article takes *sales contracts* out of the general laws limiting the time for commencing *contractual actions* and selects a four-year period as the most appropriate to modern business practice." The enormous problems caused by the characterization of a personal injury action for breach of warranty as "contractual" have long been exposed. Yet, Pennsylvania [referring to *Gardiner* and *Rufo*] and many other jurisdictions continue to apply a "contractual" statute of limitations to cases which have nothing to do with contract. They reach that result in a formalistic fashion.

*Id.* at 267 (footnotes omitted).

Dean Murray also suggests that an application of § 2–725 to non-purchaser actions would circumvent the objective of *Kassab* as well as the purpose of the personal injury statute of limitations that governs strict liability actions in Pennsylvania. Because Code warranty actions are required to be commenced within four years from the date of delivery to the buyer, it is conceivable that many injured non-purchasers could be barred from ever bringing their actions prior to the time their injury was caused by the defective product. Likewise, if a non-purchaser claimant is permitted to recover under the four-year Code provision, it will be by sheer accident because he has no relationship to the date of delivery of the defective product to the buyer. *Id.* at 270.[11] In this context, § 2–725 would act as a definition of the life of the warranty, possibly cutting off a non-purchaser's cause of action before it even accrues, instead of functioning as a statute of limitations, the purpose of which is to protect defendants from the prosecution of stale claims.

In light of the possible discrepancies that the application of § 2–725 could cause in this context, and based on the *Kassab* rationale of the desirability of consistency of results in products liability cases, we conclude that the Supreme Court of Pennsylvania would apply the personal injury statute of limitations to govern Hahn's claim of breach of implied warranty in the alleged

11. As an example of this Dean Murray suggests the following.

> [I]f a non-buyer-plaintiff is personally injured and does not commence his action until twenty-five months after the injury, he may not use 402A; and, if the product was delivered to the buyer more than four years before he commences his action, neither may he use the Code. On the other hand, non-buyer B, under otherwise identical circumstances, *may* use the Code if the product happened to be delivered to the buyer less than four years from the time the action is commenced, though the action is commenced twenty-five months after the injury was sustained. This irreconcilable possibility should be eliminated . . . .

35 Pitt.L.Rev. at 270. *See, e. g., Victorson v. Bock Laundry Mach. Co.*, 37 N.Y.2d 395, 373 N.Y.S.2d 39, 335 N.E.2d 275 (1975), *overruling Mendel v. Pittsburgh Plate Glass Co.*, 25 N.Y.2d 340, 305 N.Y.S.2d 490, 253 N.E.2d 207 (1969).

sale of the defective hoist to his employer. We note that our holding on this issue comports with the result reached by the Superior Court of Pennsylvania in *Salvador v. Atlantic Steel Boiler Co.*, 256 Pa.Super. 330, 389 A.2d 1148 (1978) (*Salvador II*), *allocatur granted*, No. 455 (October 31, 1978), per Judge, now President Judge, Cercone.[12]

### IV.

The judgment of the district court will be reversed and the proceedings remanded with a direction to enter judgment in favor of the appellant.[13]

---

**12.** After the case proceeded to trial following remand by the supreme court in *Salvador I*, the facts showed that Salvador's employer had purchased the boiler as part of a bulk transfer from the I. H. English Company in 1964. In turn, I. H. English had had the boiler installed in 1962 by the defendant manufacturer. Mr. Salvador was injured in May 1967 and filed suit in 1971. The trial court granted defendants' motion to dismiss the suit as untimely, both as to the 402A claim because it was not brought within two years of the date of injury, and as to the UCC warranty claim because the suit was instituted four years after the date of tender of delivery, whether delivery was considered to be the bulk transfer or the installation of the boiler. The superior court in *Salvador II* affirmed the dismissal, ruling that the two-year limitations statute should be uniformly applied to all third party personal injury claims arising from defective products, whether brought in trespass or assumpsit.

*Salvador II* was handed down on July 12, 1978, two months after the conclusion of the trial in the case at bar. The district court believed that as a decision of an intermediate appellate court, *Salvador II* announced a new rule of law in Pennsylvania that should not be

applied retroactively because it marked a sharp departure from earlier Pennsylvania Supreme Court cases, namely *Gardiner* and *Rufo*, on which counsel was entitled to rely.

We disagree. As we have indicated, we believe that the law in Pennsylvania has been moving away from the *Gardiner-Rufo* approach for quite some time, as evidenced by the supreme court decisions in *Webb v. Zern, Kassab*, and *Salvador I*. In this light, the superior court's opinion in *Salvador II* is not a departure from, but rather further evidence of, this development.

**13.** Judge Garth does not believe that the statute of limitations issue should be reached or decided once we have concluded that the district court erred in not granting Eaton's motion for judgment notwithstanding the verdict based on failure of proof of sale. Accordingly, even though he agrees with the majority's analysis and conclusion, he is of the view that because Section III constitutes dictum only, there should have been no attempt to predict the result which the Pennsylvania Supreme Court will reach when it has the statute of limitations question before it in *Salvador II*.