557 A.2d 40

Connaught Laboratories, Inc., County of Allegheny and Mary Edwards, M.D., Appellants *v.* Michael Lewis, a minor, by his mother and natural guardian, Deborah Lewis, and Deborah Lewis, in her own right, Appellees.

Argued February 7, 1989, before Judges CRAIG, DOYLE and PALLADINO, sitting as a panel of three.

*Stephen M. Houghton,* with him, *Nancy R. Winschel, Dickie, McCamey & Chilcote, P.C.,* for appellant, Connaught Laboratories, Inc.

*John Newborg, Faderewski & Herrington,* with him, *Edward D. Klym,* for appellants, Allegheny County and Mary Edwards, M.D.

*Daniel M. Berger,* with him, *Michael Louik, Berger, Kapetan, Malakoff and Meyers, P.C.,* for appellees.

OPINION BY JUDGE CRAIG, April 4, 1989:

Connaught Laboratories, the County of Allegheny, and Dr. Mary Edwards (defendants) appeal the Allegheny County Court of Common Pleas denial of their motion for summary judgment. Deborah Lewis, on behalf of her son, Michael, initiated this action against the defendants, alleging breach of warranty and negligence. In response, Connaught, joined by Allegheny County and Dr. Edwards, pursued the affirmative defense of the statute of limitations in a motion for summary judgment. In a separate motion for summary judgment, Allegheny County and the county's employee, Dr. Edwards, rely upon the additional defense of immunity under Chapter 85 of the Judicial Code, 42 Pa. C. S. §§8541-8542.

The trial court certified for interlocutory review the questions of whether the applicable statutes of limitation bar litigation of Lewis' negligence and breach-of-warranty claims, and whether the Tort Claims Act precludes Lewis from suing the County and Dr. Edwards. As permitted by Pa. R.A.P 1311, 42 Pa. C. S. §702(b), we granted the appellants' petition for permission to appeal and must now consider these issues.

In a motion for summary judgment a court must view the record in the light most favorable to the non-moving party, and may grant the motion only when the moving party has established that no material issues of fact remain. *Fiore v. Pennsylvania Department of Environmental Resources*, 96 Pa. Commonwealth Ct. 477, 508 A.2d 371 (1986). Therefore, a review of the facts disclosed in the parties' briefs, depositions, affidavits and documents in the record is necessary.

On April 18, 1978, Michael Lewis, who was then less than a year old, received his first diphtheria, pertussis and tetanus vaccination (commonly referred to as DPT) in Erie, Pennsylvania. Apparently, at that time, the at-

tending medical person who administered the DPT vaccine did not discuss with Ms. Lewis, nor warn her of, any of the potential side effects known to be associated with the DPT vaccine. Michael, however, did not suffer any bad reaction from that administration.

Dr. Mary Edwards, an employee of Allegheny County's Well-Baby Clinic administered the second of the three-part DPT vaccine series to Michael on August 3, 1978. Although Ms. Lewis signed a warning form regarding DPT vaccines, Dr. Edwards did not discuss with Ms. Lewis the possibility that the DPT shot would cause any adverse reaction. That evening Ms. Lewis discovered that Michael, who had been sweating and moaning in his sleep, had a temperature of 102 degrees. Ms. Lewis then took Michael to the hospital. The attending physician examined Michael and released him, diagnosing "flu-like" symptoms.

Ms. Lewis took Michael to the clinic again on October 5, 1978, for the third DPT vaccination. On this occasion, Dr. Edwards again attended Michael. Ms. Lewis signed another warning form and told Dr. Edwards of Michael's fever following the last shot. Although Dr. Edwards told Ms. Lewis that the third shot could be administered at a later date, or in two separate administrations (one-half on that day and one-half at a later date), according to Ms. Lewis' testimony at a deposition, Dr. Edwards never discussed any possible adverse side effects, nor did she suggest that the shot should not be given to Michael at all.

That evening Michael had a seizure. Ms. Lewis immediately took Michael to the hospital, where he remained for three days. According to Ms. Lewis, Dr. Beth Jackson, who examined Michael at the hospital, stated that Michael's seizure was a reaction to the DPT vaccination administered on October 5.

On December 18 Michael had his second seizure and Ms. Lewis again took him to the hospital. Dr. Jackson, who had examined Michael after the first seizure, again attended Michael during his stay in the hospital. At that time, Ms. Lewis, apparently uncertain of Dr. Jackson's previous conclusion regarding the causal relationship between DPT and Michael's seizures, because Michael had not had a shot on December 18, asked Dr. Jackson if there was, indeed, a relationship between the DPT vaccines and Michael's seizures, as Dr. Jackson had stated in October after the first seizure. Dr. Jackson concluded that because Michael's second seizure did not occur after a DPT shot, the first seizure, which did concur with the administration of DPT, must have been coincidental or caused by high fever, rather than causally related to the administration of the vaccine. Ms. Lewis, in her deposition, also stated that she understood that Dr. Jackson based this conclusion on the belief that DPT related seizures do not recur.

Michael continued to suffer from seizures, and his physicians diagnosed him as autistic. Ms. Lewis claims that subsequent physicians continued to advise her that Michael's condition was not related to DPT and that she did not become aware of the fact that DPT vaccines could cause recurring seizures and brain damage until 1985 when she viewed a television program that revealed a definite connection between DPT and physical reactions such as those which Michael continues to experience and which have apparently permanently impaired Michael's mental and physical capacity. Thus, Ms. Lewis did not initiate this lawsuit until September 11, 1985.

As suggested above, we must consider three issues: (1) whether the two-year statute of limitations for personal injury claims bars Lewis' cause of action; (2) whether the applicable four-year statute of limitations

bars Lewis' breach-of-warranty claim; and, (3) whether the County and Dr. Edwards may successfully assert immunity under the Tort Claims Act.

## Breach of Warranty

Connaught, wary of the discovery rule's applicability to a personal injury cause of action in tort, challenges the trial court's determination that "the plaintiff's breach of warranty claim should be reverted to fall under the two-year personal injury limitation period." The court, relying on the Pennsylvania Superior Court's decision in *Salvador v. Atlantic Steel Boiler Co.*, 256 Pa. Superior Ct. 330, 389 A.2d 1148 (1978), and a Federal Court of Appeals opinion, *Hahn v. Atlantic Richfield Co.*, 625 F.2d 1095 (3rd Cir. 1980), *cert. den.*, 450 U.S. 981 (1981), deemed that the Uniform Commercial Code, adopted in Pennsylvania, which was designed primarily to establish the rights and duties of contracting parties in a commercial transaction, only protects the interests of individuals who are in privity of contract. The trial court, finding that Lewis was not in privity with Connaught, concluded that the plaintiff's breach-of-warranty claim should be treated as a personal injury claim, thus making the two-year statute of limitations for personal injury actions, rather than the four-year limitation period for breach-of-warranty claims, applicable to Lewis' breach-of-warranty action.

As Connaught correctly points out, contrary to the Court of Appeals prediction in *Hahn*, the Pennsylvania Supreme Court has rejected the proposition that a plaintiff who sustains personal injuries through the use of, or contact with, an allegedly defective product must be in privity of contract with the seller or manufacturer in order to assert a breach-of-warranty claim under the Commercial Code. In *Williams v. West Penn Power*, 502 Pa. 557, 467 A.2d 811 (1983), the Pennsylvania Supreme

Court, recognizing "[t]he asymmetry [that] results from the disparity in the treatment between a direct purchaser and all other consumers, even though the plaintiffs were hurt in the same accident and sustained equally grievous injuries", held that the four-year statute of limitations provided in the Commercial Code is applicable to *all* breach-of-warranty claims and that no exceptions would be made merely because the claimant seeks to recover on a breach-of-warranty basis for personal injuries. 502 Pa. at 568-569, 467 A.2d at 817.

Thus, the trial court erred by allowing the breach-of-warranty claim to proceed only as a personal injury action under the two-year limitation period, and by implicitly allowing the plaintiff to claim the benefit of the discovery rule for the breach-of-warranty claim.

Regardless, however, of our conclusion that Lewis' breach-of-warranty claim must proceed under the Commercial Code, thus disallowing application of the discovery rule to the warranty claim,[1] we must nevertheless consider Lewis' argument that the appellants are estopped from raising the Code's four-year limitation period as a defense.

Lewis points out, and we agree, that the discovery rule applicable in personal injury and medical malpractice claims is a doctrine against a limitation defense separate and distinct from the doctrine of equitable estoppel.[2] *Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548 (3rd Cir. 1985). Thus, although a plaintiff cannot benefit under the discovery rule in a breach of warranty action, a plaintiff may invoke the doctrine of estoppel in order to extend the statute of limitations if the plaintiff

---

[1] *O'Brien v. Eli Lilly & Co.*, 668 F.2d 704, 711 (3rd Cir. 1981).

[2] The discovery rule effectively tolls the statute of limitations, but the estoppel doctrine precludes the defendant from raising the statute of limitations as a defense.

can prove that the defendant *caused* him to relax his vigilance by some affirmative fraud, deception or concealment of fact. *Appeal of Sepko*, 84 Pa. Commonwealth Ct. 359, 479 A.2d 665 (1984).

Furthermore, the nature of the defendant's concealment need not be intentional. The deception a plaintiff must prove to activate the estoppel theory may be unintentional. *Sepko*, 84 Pa. Commonwealth Ct. at 362, 479 A.2d at 667.

Of course, a determination of whether a defendant acted to conceal information from a plaintiff is generally a question for the jury or factfinder; however, in light of the facts revealed in Lewis' deposition and other evidence in the record, we do not believe it is necessary to consider whether any of the defendants acted to conceal information from Ms. Lewis. In our opinion, the estoppel doctrine is relevant only in those cases in which the defendant's conduct causes the plaintiff to deviate from his inquiry. *Ciccarelli.*

For example, in *Snyder v. Penn Central Transportation Co.*, 296 Pa. Superior Ct. 69, 442 A.2d 300 (1982), the Superior Court concluded that an employer was not estopped from raising the statute of limitations as a defense, despite certain misstatements which caused the plaintiff to delay the initiation of his legal action, because the plaintiff later learned of the misstatements but nevertheless failed to pursue his cause, without a justifiable excuse.

In Lewis' case we cannot ignore her own admission, given in her deposition, that she read signs on the wall of the Well-Baby Clinic that warned of the potential side effects associated with DPT. Additionally, the record contains several forms Lewis signed on the dates the DPT was administered to Michael which acknowledge that: (1) she read the information attached to the form regarding

DPT vaccines; (2) she had the opportunity to ask questions about the vaccine that were answered to her satisfaction; and, (3) she subjectively understood the benefits and risks of the DPT vaccine. Although the information sheet is not attached to the signed forms, those forms clearly refer to a detailed information sheet which, according to Lewis' signed acknowledgement, had been attached for her information. A copy of the information sheet included in the record warns that children may suffer reactions to the vaccine including high fever, convulsions and brain damage.

We must conclude from those signed forms that Lewis actually read the information sheet, and that therefore she is not entitled to claim that Connaught, Allegheny County or Dr. Edwards are equitably estopped from raising the statute of limitations with regard to Lewis' breach-of-warranty claim. Thus, the statute began to run on the breach-of-warranty claim, at the latest, when Dr. Edwards administered the third dose of vaccine to Michael on October 5, 1978.[3] Because Lewis did not initiate her claim before the four-year limitation period had elapsed, her breach-of-warranty claim is barred.

## *The Discovery Rule*

The discovery rule is a judicially created standard that is applied in personal injury and medical malpractice actions to determine the beginning of the appropriate limitations period within which an injured party must

---

[3] The Commercial Code considers the date on which the breach occurs as the date on which a cause of action accrues for the purpose of determining when the limitations statute begins to run. Title 13 Pa. C. S. §2725(b) states that "[a] breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

bring a claim against a tortfeasor. First announced by Justice MUSMANNO in *Ayers v. Morgan*, 397 Pa. 282, 154 A.2d 788 (1959), the test of whether the statute of limitations has started to run in medical malpractice cases is as follows:

> [T]he statute of limitations begins to run . . . when the plaintiff knows, or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct.

*Larthey by Larthey v. Bland*, 367 Pa. Superior Ct. 67, 72, 532 A.2d 456, 459 (1987). The court in *Larthey* specifically recognized the inconsistent decisions handed down after *Cathcart v. Keene Industrial Insulation*, 324 Pa. Superior Ct. 123, 471 A.2d 493 (1984), which had honed the discovery rule to this two-part test, and affirmatively discarded the three-prong test announced in *De-Martino v. Albert Einstein Medical Center, N.D.*, 313 Pa. Superior Ct. 492, 460 A.2d 295 (1983).

As a preliminary matter, we note that, in Pennsylvania, a plaintiff's claim for all injuries arising out of the same tortious conduct of a defendant must be brought within two years of the time that the plaintiff knows, or in the exercise of reasonable diligence should know, of his initial injury, and that the injury was caused by another's wrongful conduct. *Cathcart*, 324 Pa. Superior Ct. at 149, 471 A.2d at 507. Thus, for the purpose of examining the application of the discovery rule in this case, we must consider when Ms. Lewis should reasonably have known of Michael's initial injury, his first seizure, *and* that the injury was caused by someone's tortious conduct.

In developing the discovery rule's definitional standards, Pennsylvania courts have held that, in order to satisfy the test, the plaintiff does not have to be aware that negligent treatment has occurred or that a cause of action

may have arisen. *Cistay v. Reich*, 380 Pa. Superior Ct. 366, 551 A.2d 1096 (1988).

Additionally, Pennsylvania courts have concluded that "mere mistake, misunderstanding or lack of knowledge do not toll the running of the statute of limitations." *DeMartino; Acker v. Palena*, 260 Pa. Superior Ct. 214, 393 A.2d 1230 (1978).[4] In order to invoke the discovery rule, a plaintiff must act with due diligence in trying to determine the cause of the injuries. *DeMartino*.

In *DeMartino*, the Superior Court considered the claim of a plaintiff who had sued his dentist for malpractice. The defendant had performed endodonic treatment on the plaintiff. Three and one-half years after those treatments began, another dentist, to whom the defendant had referred the plaintiff, suggested that one of the plaintiff's teeth had been negligently treated. When the plaintiff informed this dentist that the work in question had been done by one of the dentist's colleagues, the dentist refused to discuss the matter further.

The court in *DeMartino* noted that the question of whether a plaintiff has exercised due diligence in discovering their injuries, for the purpose of the statute of limitations, although normally a question for a jury, could be resolved in a motion for summary judgment if a jury could not have found that the second dentist's observation which suggested his colleague's negligence did not provide sufficient notice of wrongdoing.

We are now faced with a similar question, and yet the facts which we must consider in evaluating Ms. Lewis' claim contain twists that have never before been pre-

---

[4] As noted above in our examination of the equitable estoppel doctrine for the purpose of Lewis' breach of warranty claim, a plaintiff could argue that the statute should be tolled if the defendant acted to conceal misconduct. However, for the reasons we gave in that discussion, Ms. Lewis cannot claim estoppel in her personal injury action either.

sented to our courts: (1) whether, after Dr. Jackson informed Ms. Lewis on October 5, 1978 that the DPT vaccination administered that day had *caused* Michael's seizure, Ms. Lewis satisfied the discovery rule's requirement of due diligence by inquiring no further into the cause of that seizure until two months later, when, on December 18, after Michael suffered his second seizure, Dr. Jackson told Ms. Lewis that because the second seizure did not concur with the administration of DPT, the concurrence of the first seizure and the DPT vaccine must have been a mere coincidence, and, (2) whether her reliance on Dr. Jackson and Michael's subsequent physicians excused her failure to investigate further into Michael's condition.

Ms. Lewis also argues that her actions were reasonable because she was convinced that Michael's reactions were idiosyncratic. However, we are not persuaded that her subjective distinction in considering the nature of Michael's injury is relevant under the discovery rule. As stated above, for the running of the statute to begin, a plaintiff need not know the precise nature of his injuries, only that an injury has occurred and that the injury is related somehow to the conduct of the defendant.

Although a number of cases consider whether a patient's reliance on a physician's opinion is a reasonable excuse for a plaintiff to relax his investigation into an injury, all of these cases refer either to acts by the defendant physician (whose motives may have been to conceal the true nature of a plaintiff's injury) or to situations in which a plaintiff's reliance on a physician's conduct is plainly unreasonable, once the plaintiff has been put on notice of the injury and the possible cause.

For example, in *Kelly v. Johns-Manville Corp.*, 590 F. Supp. 1089 (E.D. Pa. 1984)[5] the Federal District

---

[5] This case was decided under New Jersey's discovery rule decisions. We cite it as an example merely for the purpose of illustration and analogy.

Court considered whether a plaintiff acted with due diligence in investigating his injury. In *Kelly* the plaintiff's physician informed the plaintiff in 1975 that his illness was probably related to the plaintiff's job, which required working with asbestos. The plaintiff claimed that after the physician rendered that opinion, plaintiff, in the course of employment, had several x-rays taken. The plaintiff claimed that the *silence* of the doctors who had taken the x-rays regarding the conditions which the x-rays were supposed to reveal—the presence of an asbestos related disease, lulled him into a state of relaxed vigilance, and that he failed to make further inquiries only because the doctors did not tell him that anything was wrong.

The court concluded, however, that the plaintiff could not claim that his reliance was reasonable because he admitted that he did not know that the x-rays were supposed to reveal the existence or non-existence of asbestosis, and thus could not reasonably rely on the silence of the doctors regarding his x-rays. The court stated that under the circumstances, the doctors' silence could not erase the knowledge of the causal relationship that his doctor had given him in 1975.

Our research also discloses a Superior Court opinion in which that court concluded that when a plaintiff receives a tentative diagnosis, which is not confirmed until a later date, the statute of limitations does not begin to run until a plaintiff obtains a firm diagnosis.

*Trieschock v. Owens Corning Fiberglas*, 354 Pa. Superior Ct. 263, 511 A.2d 863 (1986), involved a pipefitter's action against an asbestos manufacturer. The Superior Court held that the plaintiff's physician's tentative diagnosis that contact with asbestos had caused the plaintiff's injury was not sufficient to start the statute of limitations running, but did activate the plaintiff's duty to determine with due diligence whether he did in fact

have asbestosis. Thus, the Superior Court determined that the statute did not begin to run until one month later when a physician examined him and determined that asbestos had caused his injury.

Thus, the *Trieschock* case suggests that when a plaintiff is put on notice of an injury and the cause of the injury, that notice activates the plaintiff's duty to act with due diligence in discovering the nature and cause of his injury. In Ms. Lewis' case, Dr. Jackson affirmatively stated that DPT caused Michael's first seizure. That doctor's opinion was sufficient to make Ms. Lewis aware of the causal relationship between Michael's first seizure and the DPT vaccination.

However, in *Trieschock* the court concluded that the statute did not begin to run until a doctor made a firm diagnosis, rather than at the time the plaintiff's doctor offered his tentative opinion. By implication, the court would have found that the statute had not begun to run if the second opinion Trieschock obtained confirmed the first physician's opinion.

In our opinion, *Trieschock* supports the proposition that, despite the knowledge that may have been imputed to Ms. Lewis through the warning sheet she apparently signed before the vaccine was administered, and through Dr. Jackson's statement after Michael's first seizure, Ms. Lewis' reliance upon Dr. Jackson's second statement, regarding the lack of a causal relationship between the seizures and DPT, could be regarded as reasonable.

If Dr. Jackson's first opinion was sufficient to place Ms. Lewis on notice, then Dr. Jackson's second conclusion, which specifically negated her previous opinion, reinforces Ms. Lewis' claim that her reliance on Dr. Jackson's second opinion was reasonable, especially in light of the fact that Dr. Jackson was not involved in the

administration of the vaccine which apparently caused Michael's condition.

The defendants point out, however, that in August 1979, eight months after Michael's second seizure, Ms. Lewis cancelled an appointment Michael had at a clinic for another DPT shot. The receptionist at the clinic wrote down that Ms. Lewis stated that the reason she was cancelling the appointment was because Michael had a seizure the last time he had a DPT shot. Defendants rely on this communication as positive proof that Ms. Lewis knew of Michael's injury and the cause. Ms. Lewis, on the other hand, claims that although she may have made some statement, she does not specifically recall her exact words, and also argues that she was merely referring to the "temporal" relationship between the previous DPT shot and Michael's seizure. We do not, however, feel confident relying on this notation to establish as a fact that Ms. Lewis either actually made this statement or that she believed the substantive implications of the statement. The determination of the admissibility and credibility of such a notation is for a trial court and a jury.

Furthermore, we think that testimony at a trial could develop more fully the exact circumstances surrounding Ms. Lewis' contact with Michael's subsequent physicians who, according to Ms. Lewis' testimony, confirmed Dr. Jackson's second opinion, thus lending support to Lewis' argument that her reliance was reasonable.

Hence, we are persuaded that material issues of fact remain for determination by a jury or factfinder. In light of *Trieschock* this court cannot determine factual matters such as the reasonableness of Ms. Lewis' reliance on Dr. Jackson's second opinion.

A plaintiff resisting a motion for summary judgment "cannot expect to rely upon bare assertions, conclusory allegations, or suspicions", *Ness v. Marshall*, 660 F.2d

517, 519 (3rd Cir. 1981). However, we are not convinced that a jury could not find that Ms. Lewis exercised due diligence in discovering the actual cause of Michael's injuries. If a jury believes that Dr. Jackson and Michael's subsequent physicians told Ms. Lewis that there was no connection between Michael's seizures and the DPT vaccine, a jury could conclude that Lewis acted with the due diligence required to toll the statute of limitations.

Having determined that material issues of fact remain, we must affirm that portion of the trial court's order denying summary judgment with respect to Deborah Lewis' personal injury action.

## Governmental Immunity

Before the Pennsylvania Supreme Court's decision in *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973) political subdivisions generally enjoyed immunity from suit. *Ayala* abrogated the doctrine of governmental immunity.[6] Thus, between 1973 and the effective date of the Political Subdivision Tort Claims Act,[7] January 24, 1979, plaintiffs could bring a cause of action against governmental authorities and their employees.

In *Marino v. Seneca Homes*, 63 Pa. Commonwealth Ct. 534, 439 A.2d 1287 (1982), this court examined the question of whether the Commonwealth was immune under 42 Pa. C. S. §8521 as to causes of action that

---

[6] *Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 388 A.2d 709 (1978) abrogated the judicially created doctrine of sovereign immunity. The General Assembly passed legislation in 1978, however, that makes the Commonwealth immune from suit, with eight specific exceptions. 42 Pa. C. S. §§8521-8526.

[7] JARA, The Judiciary Act Repealer Act, Act of October 5, 1980, P.L. 693 repealed The Political Subdivison Tort Claims Act which appeared at 53 P.S. §§5311.201-5311.307. Chapter 85 of JARA replaced the immunity provisions of the Tort Claims Act. Governmental Immunity provisions now appear at 42 Pa. C. S. §§8541-8550.

accrued before and after the effective date of that statute. Judge MACPHAIL, who wrote the opinion, concluded that sovereign immunity under the act barred only those causes of action that accrued after the effective date of the act.

The County argues that if the discovery rule is applicable, then Lewis' cause of action did not accrue until the time of discovery, which was after the effective date of the Tort Claims Act. Lewis, on the other hand, argues that despite the applicability of the discovery rule, a cause of action arises on the date of injury, which in this case was the date of Michael's last vaccine in October 1978, a period during which the County could not claim immunity under case law or the Tort Claims Act. We agree.

Under the discovery rule, discussed above, for the purpose of determining when the statute of limitations begins to run, courts regard the date of discovery rather than the date of injury in order to start the running of the statute of limitations. In our opinion, however, the *cause of action* still arises on the date of injury, and not on the date of discovery. Thus, we must conclude that Michael Lewis' cause of action arose on the date of his initial injury in October 1978, before the effective date of the Tort Claims Act, and therefore, the County and Dr. Edwards are not immune from suit.

## ORDER

Now, April 4, 1989, the order of the Court of Common Pleas of Allegheny County at No. G.D. 85-14333, dated June 22, 1988, is reversed in part and affirmed in part. We reverse the denial of the appellants' motion for summary judgment with respect to the plaintiff's breach-of-warranty claim, and thereby grant the motion. However, we affirm the trial court's denial of summary judgment with regard to the plaintiff's personal injury claim

and with regard to the immunity of Allegheny County and Dr. Edwards.

## AMENDED ORDER

NOW, THIS 5th day of June, 1989, the Order of this Court entered at No. 454 Miscellaneous Docket No. 4 on April 4, 1989 is amended to read:

The Order of the Court of Common Pleas of Allegheny County at No. G.D. 85-14333, dated June 22, 1988, is reversed in part and affirmed in part. We reverse the denial of the appellants' motion for summary judgment with respect to the plaintiff's breach of warranty claim, and thereby grant the motion. However, we affirm the trial court's denial of summary judgment with regard to the plaintiffs' personal injury claim and with regard to the immunity of Allegheny County and Dr. Edwards.

This Court is of the opinion that the affirmance of the trial court's denial of summary judgment with regard to plaintiffs' personal injury claim involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from that part of the Order may materially advance the ultimate termination of this matter.