O'BRIEN, Ann C., Appellant,

v.

ELI LILLY & COMPANY; E. R. Squibb
& Sons, Inc.; the Upjohn Company,
and Winthrop Company, Inc.

No. 81–1291.

United States Court of Appeals,
Third Circuit.

Argued Sept. 21, 1981.

Decided Dec. 28, 1981.

As Amended Jan. 5, 1982.

Rehearing and Rehearing In Banc Denied
Jan. 21, 1982.

R. J. Woodside, Jack M. Hartman (argued), Shearer, Mette & Woodside, Harrisburg, Pa., for appellant.

Edward W. Madeira, Jr. (argued), Nancy J. Gellman, Nina M. Gussack, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellee Eli Lilly & Co.

David J. Griffith (argued), Ross F. Schmucki, Harvey, Pennington, Herting &

Renneisen, Philadelphia, Pa., for appellee E. R. Squibb & Sons, Inc.

George J. Lavin, Jr., Thomas J. Finarelli (argued), Liebert, Short, Fitzpatrick & Lavin, Philadelphia, Pa., for appellee, Winthrop Laboratories.

G. Thomas Miller, McNees, Wallace & Nurick, Harrisburg, Pa., for appellee Upjohn Co.

Before ALDISERT, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The question for decision in this appeal from a summary judgment in favor of four defendant pharmaceutical manufacturers in a diversity action is whether the district court properly applied the Pennsylvania "discovery rule," which modifies the personal injury statute of limitations. The district court determined that, if she had exercised due diligence, appellant Ann O'Brien reasonably could have discovered in February 1976 that her mother had taken Diethylstilbestrol (commonly known as Stilbestrol or DES) during her 1956 pregnancy and that the drug arguably caused appellant's subsequent cancer. She did not file her complaint until December 31, 1979; accordingly, the district court concluded that the suit was barred by the two-year statute of limitations. Appellant contends that whether she possessed the knowledge necessary in 1976 to start the running of the statute was a jury question. Conceding that this is a close case, we nevertheless

find no genuine issue of material fact and affirm the grant of summary judgment.

## I.

The relevant Pennsylvania statute of limitations for personal injury actions states:

The following actions and proceedings must be commenced within two years:

. . . .

(2) An action to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another.

42 Pa.Cons.Stat.Ann. § 5524(2). The district court applied this statute in granting appellees' motion for summary judgment. Appellant's warranty claims implicate a four-year statute and are discussed below in Part IV of this opinion.

Statutes of limitation express the legislatures' public policy judgments of how long a plaintiff may delay suit without being unfair to a defendant. *Overfield v. Pennroad Corp.*, 42 F.Supp. 586, 614 (E.D.Pa. 1941), *aff'd*, 146 F.2d 889 (3d Cir. 1944). "These and similar legislative enactments are expressive of the feeling of mankind that where there are wrongs to be redressed, they should be redressed without unreasonable delay, and where there are rights to be enforced, they should be enforced without unreasonable delay." *Ulakovic v. Metropolitan Life Ins. Co.*, 339 Pa. 571, 576, 16 A.2d 41, 43 (1940).[1]

Nevertheless, Pennsylvania courts have recognized the potential harshness inherent

---

[1] The Supreme Court of Pennsylvania in *Ulakovic* set forth the following explanation of the policy behind Pennsylvania statutes of limitation:

It has always been the policy of the law to expedite litigation and not to encourage long delays. From this fact arose the various statutes of limitations, and the reasons why the law is unfavorable to delayed litigation are self-evident. If any person has a right which he wishes enforced, he should enforce it promptly. The person against whom the right is to be enforced might be greatly prejudiced by plaintiff's delay. Witnesses disappear or remove to distant parts and the entire aspect of the parties on both sides may

change with the lapse of time. In *Waring Bros. v. Pennsylvania R. R. Co.*, 176 Pa. 172, 35 A. 106, 107, this court, in an opinion by Justice Green, quoted with approval what Chief Justice Black said in *Huffman's Heirs v. Stiger*, 1 Pittsb.Leg.J. 185: "No honest man would be willing to live in a country where the law would require him to prove the actual falsehood and injustice of every stale claim which malice or cupidity might dig up against him. Hence we have statutes of limitation, and, in cases to which they do not apply, we have presumptions which are equally strong."

339 Pa. at 575, 16 A.2d at 42–43.

in a rigid application of the statute and long ago carved out an exception: ignorance of an injury may delay the running of the statute of limitations. *Lewey v. Fricke Coke Co.*, 166 Pa. 536, 31 A. 261 (1895). The judicially created "discovery rule" announced in *Lewey* has been expanded to except the plaintiff who is aware of his injury but not its cause. *Ayers v. Morgan*, 397 Pa. 282, 154 A.2d 788 (1959). Federal courts in this circuit have helped to refine the precept. Our district courts have noted that the rule delays the accrual of a cause of action from the time of a defendant's tortious conduct to a time when the injury and its cause become known or knowable, *Gemignani v. Philadelphia Phillies Nat'l League Baseball Club*, 287 F.Supp. 465, 467 (E.D.Pa.1967), that it is a rule intended to benefit plaintiffs in that it avoids potential injustice caused where an injury is "inherently unknowable" at the time of a defendant's conduct, *Landis v. Delp*, 327 F.Supp. 766, 768 (E.D.Pa.1971); *Prince v. Trustees of the Univ. of Pennsylvania*, 282 F.Supp. 832, 840 (E.D.Pa.1968); *Daniels v. Beryllium Corp.*, 227 F.Supp. 591, 595 (E.D.Pa. 1964), and that the legislatively declared desirability for repose and judicial administrative expediency will not be unduly affected by the small number of "inherently unknowable" injuries, *Prince v. Trustees*, 282 F.Supp. at 840. Moreover, this court, in *Bayless v. Philadelphia Nat'l League Club*, 579 F.2d 37 (3d Cir. 1978), and *DaMato v. Turner & Newall, Ltd.*, 651 F.2d 908 (3d Cir. 1981) (per curiam), adopted the reasoning and the precept announced by our colleague A. Leon Higginbotham, Jr. (then a district judge) in *Gemignani*: in a personal injury

action under Pennsylvania law, the period of limitations begins to run "from the time the plaintiff, through the exercise of reasonable diligence, should have learned both the facts in question and that those facts bore some causative relationship to the injury."[2] *Gemignani*, 287 F.Supp. at 467; *see Bayless*, 579 F.2d at 40. In further refining the test, Pennsylvania courts have developed a precise analysis defining the elements of the discovery rule. *Coyne v. Porter-Hayden Co.*, 286 Pa.Super. 1, 5–6, 428 A.2d 208, 209–10 (1981); *Anthony v. Koppers Co.*, 284 Pa.Super. 81, 95–97, 425 A.2d 428, 436 (1980), *rev'd, other grounds*, 496 Pa. 119, 436 A.2d 181 (1981); *Volpe v. Johns-Manville Corp.*, 4 P.C.R. 290, 295 (C.P.Phila. County 1980). We will discuss this analysis in detail in Part III of this opinion.

We use the discovery rule to measure the facts adduced in the summary judgment proceedings below. We are not presented with a question of choice or interpretation of the precept; rather the dispute is over the application of the precept to the facts presented to the district court. We will review the facts in detail and in the light most favorable to the appellant, essentially as set forth in her brief.

II.

In July 1956, Mary Ann O'Brien, appellant's mother, consulted Dr. Kenneth L. Cooper, a gynecologist and obstetrician, concerning her pregnancy with appellant Ann O'Brien, who was born on February 18, 1957. Because Mrs. O'Brien's previous pregnancy had terminated in a miscarriage,

---

2. *Gemignani* was an action brought under the Pennsylvania Survival Act, 20 Pa.Stat.Ann. § 320.601 (reenacted as 42 Pa.Cons.Stat.Ann. § 8302). In denying a motion for summary judgment, Judge Higginbotham adopted the discovery rule rationale developed in personal injury and property damage cases. *See Ayers v. Morgan*, 397 Pa. 282, 154 A.2d 788 (1959); *Smith v. Bell Telephone Co.*, 397 Pa. 134, 153 A.2d 477 (1959). Recently the Supreme Court of Pennsylvania distinguished survival actions from personal injury actions. It held that because survival actions merely permit a decedent's personal representative to enforce the

cause of action that accrued before the decedent's death, where the knowledge of the causal connection between the injury and its cause is not discovered until after the decedent's death, no action has accrued that can be preserved under the survival statutes. *Anthony v. Koppers Co.*, 496 Pa. 119, 436 A.2d 181 (1981). The Pennsylvania court expressly limited its decision to survival and wrongful death actions, *id.* at 124, 436 A.2d at 184; therefore, insofar as Judge Higginbotham's discussion applies to personal injury actions, we continue to consider it persuasive.

Dr. Cooper on July 26, 1956, prescribed 25 milligrams of Stilbestrol. In her deposition Mrs. O'Brien recalled that Dr. Cooper had prescribed some medication during this pregnancy, but she did not know the specific kind. She did recall taking a "red pill" or "white pill" during her pregnancy with appellant. App. at 102–03. Mrs. O'Brien testified: "I took whatever he prescribed and never questioned . . . it, I simply took it, if he prescribed it, I took it." *Id.* at 102.

During the summer of 1971, when she was fourteen years old, appellant experienced unusual vaginal bleeding. In September of that year, upon examination by a gynecologist, Dr. Carl Dorko, and following a recommendation by her pediatrician, Dr. Frank Procopio, she was admitted to the Harrisburg Hospital for diagnosis. Dr. Dorko discovered a tumor and performed a biopsy. In addition to the pathology report prepared by the Harrisburg Hospital pathologist, the biopsy slides were sent for evaluation to Dr. Robert Scully, a pathologist at Massachusetts General Hospital.

Dr. Scully responded that the tumor "fits into the category of clear cell carcinoma occurring in young women that we have found to be frequently associated with maternal Stilbestrol administration." App. at 178. Dr. Dorko informed Mr. and Mrs. O'Brien of the biopsy results and referred their daughter for treatment to Dr. John Mikuta, a gynecologist and oncologist at the Hospital of the University of Pennsylvania. There, in October 1971, appellant underwent a radical hysterectomy, lymph node dissection, and partial vaginectomy. She received radiation therapy for six weeks.

Appellant's parents requested that she not be told that her tumor was malignant. All doctors participating in her diagnosis and treatment cooperated with that wish and her parents did not themselves tell her of the malignancy.

Shortly before appellant's surgery, in the fall of 1971, her mother met with Dr. Mikuta. During this meeting, Dr. Mikuta asked Mrs. O'Brien whether she had ever taken diethylstilbestrol to prevent a miscarriage. Mrs. O'Brien denied taking the medication. App. at 114, 122–23.

In 1971, Dr. Scully and Dr. Arthur Herbst of Massachusetts General Hospital reported in the medical literature an association between maternal ingestion of diethylstilbestrol during pregnancy and clear cell adenocarcinoma in the female offspring of that pregnancy. As a means of centralizing data obtained from such cases, Drs. Herbst and Scully established a Registry for Adenocarcinoma of the Genital Tract in Young Women. Dr. Mikuta was familiar with the work of Drs. Herbst and Scully. He discussed appellant's case with Dr. Herbst as well as with Drs. Cooper and Dorko in late 1971 and early 1972.

In October 1971, Dr. Herbst wrote to Dr. Dorko, enclosing two questionnaire forms pertaining to appellant, her treatment, medical history, and family history. Following a telephone conversation with Mrs. O'Brien in January 1972, Dr. Dorko sent her one of the forms asking her to "fill out as much of it as you can." App. at 186–87. The form included the question, "Did mother take hormones during pregnancy?" Mrs. O'Brien has stated, in an affidavit, that the answer "No" on the form is in her handwriting and was placed there in late January 1972. App. at 186. The form also asked for "Other medications taken during pregnancy (name, dosage, and when taken)." Diethylstilbestrol is not among the medicines Mrs. O'Brien listed in response.

Shortly before her regular appointment with Dr. Mikuta in February 1976, appellant read an article in a January 1976 issue of *Newsweek*.[3] At this time she knew that

---

**3.** The article stated, in part:

For Grace Malloy, childbearing did not come easily. Although her first daughter was born in 1946 without complications, a subsequent pregnancy ended in miscarriage. When during her next pregnancy she also showed signs of miscarrying, her doctor pre-

scribed diethylstilbestrol (DES), a synthetic estrogen widely used in such cases at the time. A second daughter, Patti, was delivered in 1951. After yet another miscarriage, Mrs. Malloy became pregnant a fifth time and was again given DES. Another daughter, Marilyn, was born in 1956.

her mother had suffered a miscarriage before appellant was born. App. at 157. She also knew that Dr. Cooper was her mother's obstetrician. *Id.* at 156.

In her deposition, Ann recollected the article and her subsequent discussion with Dr. Mikuta:

A. Well, the article talked about a girl whose mother had taken DES and the girl had cancer. And the article talked about the procedure, the surgical procedure ... that she had gone through. And what happened to her after that and she died.

And everything about the procedure that she had gone through—or almost everything—was what I had gone through. And it was all too close, the cancer, and this was my concern, not DES at that point. And I was quite upset with Doctor Mikuta, I was very adamant that I wanted an answer from him whether I had cancer or not. And he said that I did.

Q. Did you ask him whether it was in any way DES related?

A. Yes. And he said that it pointed to that but they were not sure.

Q. It pointed to DES but they were not sure?

A. Not sure. And we continued to talk about cancer.

Q. Did he tell you why it pointed to DES?

A. No.

Q. Did he tell you why they were not sure?

A. No.

. . . . .

Q. Did Doctor Mikuta indicate to you why he responded that the cancer pointed to DES?

A. Because of the type of cancer that it is or was.

Q. Did he say that to you?

A. Yes.

Q. Did he ever say to you that it pointed to DES because your mother had taken it?

A. I don't think so.

App. at 147–48, 156–57.

In April 1976, Ann O'Brien confronted her mother about concealing the truth about the tumor. She was very upset with her parents and dissatisfied with Mrs. O'Brien's explanation for withholding the information. During the course of that confrontation, appellant also asked her mother whether she had taken DES during her pregnancy. Her mother denied taking the drug. Although Mrs. O'Brien does not remember her daughter asking prior to September 1979 whether she had taken DES, appellant's recollection of the 1976 conversation is very clear. App. at 149–51.

It was not until Patti and Marilyn were 19 and 14 that Grace Malloy read a newspaper report linking DES to a rare but deadly form of vaginal cancer in young women whose mothers had taken the hormone during pregnancy. Alarmed, Mrs. Malloy asked her doctor if there was anything to this "scare." "You bet your life there is," he replied. "You'd better get those girls in for an examination right away." The result was bad news: Marilyn had vaginal cancer.

Malignancy: In an operation lasting more than twelve hours, Marilyn's vagina and nearby lymph glands were removed; an artificial vagina was constructed using skin grafts from her legs. The doctors were hopeful that they had excised the entire malignancy, but a year later they discovered that the cancer had spread to one lung, the esophagus and the lining of the heart. Following another operation, Marilyn recovered sufficiently to resume her passion—horseback riding.

A short time later Marilyn's condition worsened. She lost her appetite, suffered from nausea and severe headaches. Tests revealed that the cancer had reached her pituitary gland, and Marilyn underwent a grueling six week regimen of "whole head" radiation. When all her hair fell out as a result, she still refused to give in to self-pity and kept up an active social life, wearing a bright scarf over her head. But at night Mrs. Malloy could hear her daughter moaning in pain with the cancer that was continuing its lethal spread through her arms, legs, spine and brain. Soon she was blind and confined to a wheelchair. Marilyn died on May 26, 1974, two weeks before her high school class's graduation.

*Daughters of DES, Newsweek*, January 26, 1976, at 66, *reprinted in* app. at 185.

Three years later, in the summer of 1979, appellant became aware of additional magazine and newspaper articles on the relationship of DES ingestion by pregnant women to the incidence of cancer in female offspring. Although the record does not set forth the content or text of these articles, she testified that again she was struck by the similarity between her own medical history and the type of cancer and treatment described. App. at 153–54.

In September 1979, appellant again asked her mother if she had taken DES while pregnant, and Mrs. O'Brien again replied that she had not. This time, however, appellant insisted that her mother call Drs. Cooper and Mikuta in order to determine if in fact she had taken the drug. According to appellant, both doctors confirmed that it had been prescribed for Mrs. O'Brien. Mrs. O'Brien also contacted the Kolb Pharmacy in an attempt to identify the manufacturer of the diethylstilbestrol she had purchased there, but found that any records the pharmacy might have maintained were destroyed in the Hurricane "Agnes" flood of 1972. Thereafter, on December 31, 1979, appellant filed her complaint against four leading manufacturers of DES.

### III.

In *DaMato v. Turner & Newall, Ltd.*, 651 F.2d 908 (3d Cir. 1981)(per curiam), we noted Pennsylvania's acceptance of a standard for defining the level of knowledge a plaintiff must have before the period of limitations will start to run. *See Anthony v. Koppers Co.*, 284 Pa.Super. 81, 95–97, 425 A.2d 428, 436 (1980), *rev'd, other grounds*, 496 Pa. 119, 436 A.2d 181 (1981). As set forth by Pennsylvania Common Pleas Court Judge Takiff in *Volpe v. Johns-Manville Corp.*, 4 P.C.R. 290 (Phila.C.P.1980), the standard has three elements:

> With the question of "reasonableness" as a constant qualification running through the decisional law, the principle emerges that three independent phases of knowledge must be known or knowable to plaintiff before the limitations period commences: (1) knowledge of the *injury*;

> (2) knowledge of the *operative* cause of the injury; and (3) knowledge of the *causative relationship* between the injury and the operative conduct.

4 P.C.R. at 295.

Measuring the instant facts against this three-part standard, we are persuaded that in 1976, when Ann O'Brien was told that she had had cancer, she acquired knowledge of her injury; and that when she read the *Newsweek* article and consulted with Dr. Mikuta she acquired knowledge from which, by the exercise of due diligence, she could have discovered both the alleged operative cause of her injury—her mother's ingestion of DES—and the causal relationship between the operative conduct and her injury.

Appellant concedes the first element, knowledge of injury by 1976, but she contends that there was sufficient controversy regarding the second and third elements to require submission to a factfinder the issue of when she could have acquired information about the causal relation to DES by the exercise of due diligence. We do not agree. There is no dispute to be resolved by a factfinder. The question is solely whether from the facts presented a jury could reasonably conclude that appellant, if she had exercised due diligence, could not have discovered the operative cause of her injury and the causal relationship in 1976.

Appellant argues that because she did not know that her mother had taken DES until September 1979, she did not acquire actual knowledge of the cause of her injury until then. The acquisition of actual knowledge, however, is not the trigger for the running of the limitations period under Pennsylvania law. The correct inquiry, as appellant recognizes, is not whether she had actual knowledge of all three *Volpe* elements before 1979, but "whether [she] should reasonably be charged with that knowledge before that time." Brief for Appellant at 19. We held in *Bayless* that the statute runs "from the time the plaintiff, through the exercise of due diligence, should have learned" the facts and their relationship. 579 F.2d at 40. The policy enunciated by Judge Takiff in *Volpe* is also applicable:

Plaintiff's ignorance of his injury or its cause may render knowledge of his cause of action unknown and unknowable. But once he possesses the salient facts concerning the occurrence of his injury and who or what caused it, he has the ability to investigate and pursue his claim. Postponing the commencement of the limitations period until he has actually done so would nullify the justifiable rationale of the statute of limitations and permit the prosecution of stale claims.

*Volpe*, 4 P.C.R. at 303–04. Although *Volpe* dealt with the relationship of the discovery rule to ignorance of a legal cause of action, the same considerations are present in a case in which a plaintiff has facts sufficient to prompt an investigation but does not investigate.

The flaw in appellant's case is her failure to present evidence sufficient to permit a jury to find that she could not reasonably have possessed "the salient facts concerning the occurrence of [her] injury and who or what caused it" before 1979. The facts recited in Part II of this opinion demonstrate that in 1976 appellant knew the facts necessary to complete her investigation: (1) that her mother had miscarried prior to appellant's birth, (2) that appellant's medical history had a marked similarity to the medical history of other young women whose cancers had been linked to DES ingestion by mothers who had previously miscarried, (3) that her doctors believed her medical history pointed in the direction of DES, and (4) the identity of her mother's obstetrician.

The district court's conclusion that as a matter of law appellant unreasonably delayed investigating is underscored by the similarity of appellant's knowledge in 1976 to her knowledge in 1979. The record shows only two historical events of 1979 supplementing the basic factual matrix of 1976: (1) appellant read some additional articles on DES and (2) she insisted that her mother ask Dr. Cooper if he had prescribed DES to her during her pregnancy. The record does not indicate that appellant acquired knowledge from her reading about the DES-cancer relationship in 1979 that she had not previously acquired in 1976. Indeed, the entire record on this is most scanty:

A. There seemed to be quite a few articles on DES in the [Washington] Post and magazines. . . . and it just seemed like things were really showing up in publications. And I was reading more about it.

App. at 153. The record as to the new information gained from Drs. Cooper and Mikuta in 1979 [4] also compels our conclusion that the crucial information on causation was available upon reasonable inquiry in 1976. The 1976 *Newsweek* article was specific and presented a case history that paralleled appellant's in many ways. The record fails to show that the articles read by appellant after 1976 contained any new information about either the operative cause or the causal relationship between the operative conduct and the injury that was not contained in the 1976 *Newsweek* article. Similarly, appellant's mother provided information in 1976 that, in effect, she merely repeated in 1979. When asked by her daughter in 1976, the mother denied having taken DES. When asked again in 1979, the mother persisted in the denial. Given the foregoing circumstances, there appears to

---

4. A. I called [my mother] and I told her that I had been reading the news articles and what I had read in them and how it sounded so similar to what I had gone through and what had happened to me and that I wanted to know from her again if she had taken that drug. And she said no, that she didn't take it.
Q. Did you ask her to make any further inquiries?
A. Yes, I asked her to call [Drs.] Mikuta and Cooper about it.

Q. Did she do that, do you know?
A. Yes, she did, and [Dr.] Mikuta said she must have taken the drug because of the kind of cancer that I had.
Q. Did your mother report to you about what Dr. Cooper said?
A. That it had been—he told her that it had been indicated on his record that it was prescribed but she nevertheless does not remember taking the drug. . . .
App. at 154–55.

be no persuasive reason why appellant in 1976 could not, "through the exercise of due diligence," have requested her mother to call Dr. Cooper then to learn "both the facts in question and that those facts bore some causative relationship to the injury." *See Bayless*, 579 F.2d at 40.

The polestar of the Pennsylvania discovery rule is not a plaintiff's actual acquisition of knowledge but whether the knowledge was known or, through the exercise of diligence, knowable to plaintiff. We agree with the district court that, as a matter of law, the crucial knowledge was knowable to the appellant in 1976 and could have been obtained through the exercise of due diligence. Therefore, its conclusion that the action is barred by the statute of limitations must be affirmed.

## IV.

We need consider only one of appellant's remaining contentions.[5] In her complaint, appellant advanced a claim for breach of warranty. Under the Uniform Commercial Code, the statute of limitations period applicable to breach of warranty actions is four years. 13 Pa.Cons.Stat.Ann. § 2725; *see also* 42 Pa.Cons.Stat.Ann. § 5525(2). Thus, if characterized as a breach of warranty complaint, appellant's action would not be barred if her cause of action were deemed to have accrued in 1976.[6]

Section 2725 provides in part:

(a) General rule.—An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(b) Accrual of cause of action.—A cause of action accrues when, the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Except for explicit warranties of future performance, the statute expressly rejects a discovery rule similar to the one that has been developed for personal injury actions. Applying the statute to the facts of this case, appellant's cause of action accrued in 1956 or 1957 when Mrs. O'Brien purchased the drug. Only if the warranty explicitly extended to future performance would appellant's cause of action be deemed to have accrued at the date of discoverability. Nothing in the record provides a satisfactory description of the warranties allegedly made or even specifies whether these warranties were express or implied. In opposing appellees' motion for summary judgment, appellant failed to present evidence that the warranty extended to future performance. Although appellant cited the four-year statute of limitations and asserted that her claim was made within four years of discovery of the cause and causal

---

**5.** Appellant contends that the district court erred in not allowing her to amend her complaint to set forth a cause of action based on defendants' market share. She also disputes a contention raised by defendants in their motion for summary judgment that the failure of her parents to institute timely suit during her minority bars the present action. Our disposition of her appeal on the statute of limitations issue obviates consideration of those contentions.

**6.** Like the district court, for purposes of this discussion we assume that under 13 Pa.Cons. Stat.Ann. § 2318, appellant is a third party beneficiary of any warranty made to her parents. If she is not within the class of plaintiffs

contemplated by § 2318, her action falls within the rule laid down by the Pennsylvania Superior Court in *Salvador v. Atlantic Steel Boiler Co. (Salvador II)*, 256 Pa.Super. 330, 389 A.2d 1148 (1978), and recognized by this court in *Hahn v. Atlantic Richfield Co.*, 625 F.2d 1095 (3d Cir. 1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981), that personal injury causes of action by non-purchaser third party beneficiaries are governed by the two-year personal injury statute of limitations and are deemed to accrue at the injury. Thus, if *Salvador II* and *Hahn* apply, appellant's claim is barred for the reasons discussed in Part III of this opinion.

relationship, this was insufficient to block the grant of summary judgment. As we recently stated in *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981), "a party resisting the motion [for summary judgment] cannot expect to rely merely upon bare assertions, conclusory allegations, or suspicions." *See* Fed.R.Civ.P. 56(e). Appellant presented no evidence that would bring her action within the statute upon which she relies. We conclude, therefore, that the district court did not err in granting appellees' motion for summary judgment.

## V.

The judgment of the district court will be affirmed.

SLOVITER, Circuit Judge, concurring.

The eloquent and sympathetic dissenting opinion of our colleague, Judge Higginbotham, impels me to write separately. I believe that one could make a strong argument that termination of lawsuits on issues which are not related to the merits, such as the statute of limitations, is inherently unjust, and that delay in instituting suit should be considered by the factfinder in making the ultimate decision but that deprivation of a plaintiff's right to recovery on any issue other than the merits is too arbitrary a result to be countenanced under a system of law which seeks to achieve substantial justice. If application of the statute of limitations is often seen as harsh, in this case it is particularly tragic because, as Judge Higginbotham correctly notes, it compounds a great personal tragedy which has befallen the plaintiff.

Our legal system, however, is not premised on the personal view of justice by individual judges, notwithstanding the frequency with which such a charge is leveled by our critics. The statute of limitations is, as the name suggests, a creature of the legislature, not the judiciary, and it is the legislature, as the democratically elected voice of the people, which is uniquely equipped to grapple with the conflicting policies and considerations. See discussion in *Roberts v. Magnetic Metals Co.*, 611 F.2d 450, 458 (3d Cir. 1979) (Sloviter, J., concurring). Thus the moderating quality of the discovery rule has been read into Pennsylvania's statute of limitations not by judicial compassion but by judicial interpretation of legislative intent. *See Ayers v. Morgan*, 379 Pa. 282, 154 A.2d 788 (1959).

In this case, in 1976 plaintiff, when a college student and past her minority under Pennsylvania law, acquired both knowledge of her condition and the possible link between her condition and DES. Several months later her inquiry to her mother as to the possible causative relationship between her condition and the operative conduct, ingestion of DES, elicited a negative response, and she made no further inquiry until 1979. The same inquiry in 1979 elicited the exact same negative response. This time, however, plaintiff pressed further and insisted that her mother call the obstetrician, who confirmed the prescription of DES.

At oral argument, this court inquired in great detail as to whether plaintiff had acquired additional knowledge by 1979 which had been unknown to her in 1976. Although plaintiff testified at her deposition that she had read additional articles, those articles were not identified and are not in the record, so that the factfinder would have no basis to assume that they were qualitatively different in any way from the Newsweek article plaintiff read in 1976. The following colloquy occurred at oral argument:

> THE COURT: What did she [plaintiff] know, in nineteen—what did she or could she have known in '79 that she didn't know or couldn't have known in 1976? [Plaintiff's Counsel]: Nothing, your Honor. Everything was knowable at that time.

Transcript of oral argument, p. 8. Since plaintiff admittedly had available to her substantially the same information in 1976 that she had in 1979 when she initiated the inquiry that led to knowledge of the causative relationship between her condition and her mother's ingestion of DES, I concur in the analysis set forth in Judge Aldisert's

opinion, and in the unhappy result to which it leads.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

If when a summary judgment has been granted in behalf of four pharmaceutical companies our standard of review is to construe and review the facts in the light most favorable to the pharmaceutical companies, then I too would affirm the grant of summary judgment below. However, since under the law the pharmaceutical companies are not entitled to such a special privileged position, I respectfully dissent.

With precision the majority has stated the applicable precept that we must "review the facts in detail and in the light most favorable to the appellant [the plaintiff below]." Majority Op., Typescript at page 5. Nevertheless, I believe that the majority has misapplied that very doctrine in this case; they have unwittingly imposed on the plaintiff, a teenage victim of cancer, an unrealistic, if not an almost insurmountable burden of knowledge, inquiry and insight. In 1976 she did not know that her mother had taken diethylstilbestrol (DES) while pregnant with the plaintiff. Since her surgeon had stated in 1976 that "they were not sure" that DES was the cause of her cancer, the distilled essence of this case is bottomed on the majority's supposition that in 1976 a nineteen year old girl should have discovered that DES was the cause of her cancer in the face of her experienced surgeon's uncertainty about the cause of her cancer and despite her mother's denial that she had even taken DES.

On this record the majority concludes that "[t]he *flaw* in appellant's case is her failure to present evidence sufficient to permit a jury to find that she could not have reasonably possessed 'the salient facts concerning the occurrence of [her] injury and who or *what caused it*' before 1979." Majority Op., Typescript at 710 (emphasis added).

I disagree. The "flaw" is not in Ann O'Brien's alleged lack of diligence in ascertaining "what caused" her cancer, rather the flaw is in the majority's erroneous artic-

ulation of a far higher requirement of diligence than what a rational jury might expect from a frightened teenage cancer victim who learns for the first time that she had cancer. After learning for the first time in September 1979 that her mother had taken DES, Ann and her parents immediately sought the advice of counsel, and within four months the complaint instituting this action was filed in December, 1979. Rather than being dilatory as the majority finds, I would hold that as a matter of law a rational jury could find that Ann O'Brien was diligent and thus there was a genuine issue of material fact which precluded granting a summary judgment.

## I.

In 1971, at the age of fourteen, Ann O'Brien underwent a radical hysterectomy, lymph node dissection, and partial vaginectomy, followed by six weeks of radiation therapy for treatment of a metastatic cancer. Unknown to Ann or her parents the cancer quite conceivably was caused by DES, the medicine prescribed for Ann O'Brien's mother in 1956 when she was pregnant with Ann, ostensibly to prevent a miscarriage. Prior to Ann's surgery, Mrs. O'Brien was questioned by Dr. John Mikuta, one of Ann's doctors, about use of DES during her pregnancy with Ann. Mrs. O'Brien denied having taken DES and continued to do so until 1979 when information from her obstetrician revealed otherwise. At no time did Dr. Mikuta explain to Mrs. O'Brien the reason for his questions, or offer information about a suspected connection between Ann's type of cancer and the DES which had been prescribed for Mrs. O'Brien when she was pregnant with Ann.

It was not until 1976, five years after her surgery, that Ann learned for the first time that in 1971 she had been operated on for cancer. At the request of her parents this information was withheld from her. Shortly before her regularly scheduled appointment with Dr. Mikuta in February 1976, she read in a January issue of Newsweek magazine of a woman, Grace Malloy, who, while pregnant with one of her daughters, had

taken DES. Mrs. Malloy's daughter, Marilyn, died a slow and painful death from cancer when she was eighteen years old. App. at A–185. Realizing some similarities between her own medical history and that of the girl in the article, Ann in an emotional encounter with Dr. Mikuta, demanded to know whether she, like the girl in the article, had had cancer. It was then, in February, 1976, that Ann learned *for the first time* that she had had cancer. When questioned by Ann about whether or not her cancer was DES-related, Dr. Mikuta responded that it pointed to DES, but *"they were not sure."* Deposition of Ann O'Brien, App. at A–148 (emphasis added).

Significantly, Ann also testified in her deposition that it was the knowledge that she had had cancer and not any equivocal statements about its possible cause by DES which had the greatest impact on her.

A. Well, I went back to school and I discussed it with my roommate and my other friend. And they knew that I had read the article in the magazine and we discussed that. And we discussed cancer, that was my major point.

I also called Doctor Procopio and just asked why I wasn't told I had cancer and was I going to be all right. *And it was cancer, it was cancer, it was not DES, that was just tremendously upsetting.* I cannot verbalize to you how upset I was.

Q. Did you and your friend at college and roommate talk about DES at all?

A. No, no.

*Id.*, App. at A–149 (emphasis added).

Several months later during an upsetting encounter with her mother over why her parents had never told her that she had had cancer, Ann questioned her mother about DES. Mrs. O'Brien denied having taken DES. *Thus, in 1976 Ann had the definitive statement of her mother that she had not taken DES, the equivocal comments of Dr. Mikuta on the etiology of her cancer, and a single magazine article describing the death of a girl whose mother had taken DES.*

In 1979, after reading additional articles in which DES-related case histories were described, Ann was prompted to again ask her mother about DES. This time she followed up on her mother's denial by insisting that Mrs. O'Brien contact her obstetrician. Only then, in September of 1979, were Ann and her parents informed that the drug which Mrs. O'Brien had taken during her pregnancy was DES. Despite this record in which it is undisputed that Ann and her parents did not learn until September, 1979 that her mother had taken DES, the majority now sustains the dismissal of her case on some vague theory by which it assumes that the only permissible conclusion that any reasonable jury could reach would be that in 1976 and 1977 Ann had "unreasonably delayed investigating" the etiology of her cancer. Majority Op., Typescript at 710.

The majority's entire theory is predicated on their rigid view of what is the permissible rational conduct of a teenager who has read in a general magazine, a two-column, six paragraph article which is not written by anyone purporting to be a physician or medical expert of any type. Inherent in the majority's holding is the incredible conclusion that, in the mind of Ann O'Brien, the speculative inferences which the majority makes from a Newsweek article on DES should have outweighed the definitive denials of Ann's mother about having taken DES. I believe that it is highly possible that a jury could find that the authoritative voice of Ann's mother dispelled any suspicions or inferences which a Newsweek article, written by strangers, might have raised. The majority, in denying such a possibility, transgresses the principles and application of the "discovery rule" and summary judgment.

## II.

Though the majority sets out accurately the Pennsylvania law with respect to the "discovery rule's" modification of the statute of limitations in a personal injury suit, they misapply the standards for granting summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Rule

56(c) provides in part that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.*" (emphasis added). The court's function, in deciding whether a grant of summary judgment is merited, as Judge Aldisert wrote in *Lockhart v. Hoenstine*, 411 F.2d 455 (3d Cir. 1969), *cert. denied*, 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244 (1969), is to decide whether factual issues exist and not to decide issues of fact.

Over a quarter of a century ago, this court, speaking through Judge Maris in *Toebelman v. Missouri-Kansas Pipe Line Co.*, 130 F.2d 1016, 1018 (3 Cir. 1942) (sic), established certain principles governing summary judgment practice:

> "Upon a motion for a summary judgment *it is no part of the court's function to decide issues of fact but solely to determine whether there is an issue of fact to be tried.* All doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for a summary judgment."

Stated in different terms, one who moves for a summary judgment bears the burden of demonstrating that there is no genuine issue of material fact. *Fairbanks Morse & Co. v. Consolidated Fisheries Co.*, 190 F.2d 817, 824 (3 Cir. 1951) (sic).

411 F.2d at 458 (emphasis added) (footnote omitted). *Accord, Hanna v. United States Veterans' Administration Hospital*, 514 F.2d 1092 (3d Cir. 1975); *Sanford v. O'Neill*, 616 F.2d 92 (3d Cir. 1980).

As noted by the majority, *Gemignani v. Philadelphia Phillies National League Baseball Club, Inc.*, 287 F.Supp. 465, 467 (E.D. Pa.1967) states that the Pennsylvania personal injury statute of limitations begins to run "from the time the plaintiff, through the exercise of reasonable diligence, *should have learned both the facts* in question *and*

that those facts bore some *causative relationship* to the injury." *See also Bayless v. Philadelphia National League Club*, 579 F.2d 37, 40 (3d Cir. 1978) (quoting the language in *Gemignani* with approval). The majority also discusses the more refined articulation of this standard developed by Judge Takiff in *Volpe v. Johns-Manville Corporation*, 4 P.C.R. 290 (Phila.C.P.1980) which was quoted with approval in the recent Pennsylvania Superior Court case of *Anthony v. Koppers, Inc.*, 284 Pa.Super. 81, 425 A.2d 428 (1980), *rev'd on other grounds*, 496 Pa. 119, 436 A.2d 181 (1981); see Majority Op., at 706 n.2. Three phases of knowledge are now recognized in Pennsylvania as necessary to trigger the statute of limitations: the plaintiff must have (1) knowledge of the injury; (2) knowledge of the operative cause of the injury; and (3) knowledge of the causative relationship between the injury and the operative conduct. *Volpe*, 4 P.C.R. at 295; *Anthony*, 425 A.2d at 436.

The district court correctly points out what this circuit and the Pennsylvania Supreme Court have already stated: the question of when a plaintiff knows or reasonably should know the cause of his or her injury is a question of fact for the jury to decide. *O'Brien v. Eli Lilly and Company*, No. 78–1585, slip op. at 4 (E.D.Pa. Dec. 31, 1980); *accord Bayless*, 579 F.2d at 41; *Wetzel v. McDonnell Douglas Corp.*, 491 F.Supp. 1288 (E.D.Pa.1980); *Hoeflich v. William S. Merrell Company*, 288 F.Supp. 659 (E.D.Pa. 1968); *Smith v. Bell Telephone Company of Pennsylvania*, 397 Pa. 134, 153 A.2d 477 (1959). A court may remove this question from the jury and decide it as a matter of law in a summary disposition only if the evidence or any reasonable inference therefrom, interpreted in a light most favorable to the non-moving party, indicates that *no disputed factual issue exists* as to when the plaintiff discovered or reasonably should have discovered information critical to her claim. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Sanford*, 616 F.2d at 96; *Goodman v. Mead Johnson & Co.*, 534 F.2d at 566, 575 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct.

732, 50 L.Ed.2d 748 (1977); *Wetzel*, 491 F.Supp. at 1293.

Only if the defendant companies could have demonstrated that there was no genuine factual issue as to when through the exercise of due diligence Ann should have discovered that DES was the probable cause of her injury and that her mother had taken DES, should the judge have taken the matter away from the jury and granted summary judgment. Is such a conclusive showing by the defendants possible in this case? Can it be said accurately that as a matter of law no reasonable jury could conclude that under these facts Ann was not sufficiently diligent in ascertaining in 1976 and 1977 that her mother had taken DES, even though her mother had asserted positively that she had not taken DES?

### III.

Writing for a panel which included Chief Judge Seitz and Judge Aldisert, Judge Stern said:

> If *common sense* and *reason* dictate that the limitation period is not to run at least until a plaintiff knows that he has been hurt, see *Ayers v. Morgan, supra*, 397 Pa. at 284–285, 154 A.2d at 789, then it should not run until he can reasonably determine what or who hurt him. Ordinarily, the two events will occur simultaneously, but this need not always be so. There are cases where one knows of an injury, *but not its cause.* This may be such a case.

*Bayless v. Philadelphia National League Club*, 579 F.2d at 41 (emphasis added).

If *common sense* and *reason* are the criteria by which the majority's holding must be tested, what is the majority's common sense and reasoned view as to how a nineteen year old girl should respond when she first learns that five years before she had been operated on for vaginal cancer? What is a teenage victim of cancer required to do when the surgeon who operated on her, a distinguished university medical school professor, who specialized in gynecology and oncology, advised her that he was "not sure" of the cause of her cancer? A six paragraph article in Newsweek is the only item in the record other than Dr. Mikuta's equivocal statement by which the majority seeks to justify the conclusion that in 1976 Ann should have discovered that the cause of her cancer was her mother taking DES.

The entire article reads as follows:

> For Grace Malloy, childbearing did not come easily. Although her first daughter was born in 1946 without complications, a subsequent pregnancy ended in miscarriage. When during her next pregnancy she also showed signs of miscarrying, her doctor prescribed diethylstilbestrol (DES), a synthetic estrogen widely used in such cases at the time. A second daughter, Patti, was delivered in 1951. After yet another miscarriage, Mrs. Malloy became pregnant a fifth time and was again given DES. Another daughter, Marilyn, was born in 1956.

> It was not until Patti and Marilyn were 19 and 14 that Grace Malloy read a newspaper report linking DES to a rare but deadly form of vaginal cancer in young women whose mothers had taken the hormone during pregnancy. Alarmed, Mrs. Malloy asked her doctor if there was anything to this "scare." "You bet your life there is," he replied. "You'd better get those girls in for an examination right away." The result was bad news: Marilyn had vaginal cancer.

> Malignancy: In an operation lasting more than twelve hours, Marilyn's vagina and nearby lymph glands were removed; an artificial vagina was constructed using skin grafts from her legs. The doctors were hopeful that they had excised the entire malignancy, but a year later they discovered that the cancer had spread to one lung, the esophagus and the lining of the heart. Following another operation, Marilyn recovered sufficiently to resume her passion—horseback riding.

> A short time later Marilyn's condition worsened. She lost her appetite, suffered from nausea and severe headaches. Tests revealed that the cancer had reached her pituitary gland, and Marilyn underwent a grueling six-week regimen of "whole head" radiation. When all her hair fell

out as a result, she still refused to give in to self-pity and kept up an active social life, wearing a bright scarf over her head. But at night Mrs. Malloy could hear her daughter moaning in pain with the cancer that was continuing its lethal spread through her arms, legs, spine and brain. Soon she was blind and confined to a wheelchair. Marilyn died on May 26, 1974, two weeks before her high school class's graduation.

Guilt: Today, sitting in her elegant, sun-filled La Jolla, Calif., living room, Grace Malloy tells Marilyn's story with self-control. She does not savor pathos. Nor does she feel any personal guilt over her daughter's tragic death. "I had no way of knowing what those pills would do," she says. "Thousands of women took them, but we all did it in the best of faith, because our doctors prescribed them."

Nonetheless, Grace Malloy is not without bitterness about what happened to her family—and what still may lie ahead. Her older daughter, Patti, now 25, has been diagnosed as having vaginal adenosis, a lesion that appears benign but could be the precursor of cancer. In spite of longstanding reservations, Patti recently decided to get married, and her doctors claim her prospects for a healthy future are good. But there is no guarantee; for the time being, Patti can only wait—like thousands of other young women with the same history—and pray that the killer that claimed her sister may pass her by.

"Daughters of DES," Newsweek, January 26, 1976, at 66, *reprinted in* App. at A–185.

The majority and the lower court's judgment is predicated on the assumption that upon reading those six paragraphs the plaintiff was obligated to discover the fact that her mother had taken DES, and that Ann's conduct after reading the article was so unreasonable that no rational jury could find that she was sufficiently diligent. Before analyzing what the majority would require Ann to have done, the differences in her case and that of the persons described in the Newsweek article should be noted, and one must ask what it was that Ann should have done, and why she should have been expected to do more than she did.

The Newsweek case about Grace Malloy is significantly different than Ann's case. First, Mrs. Malloy knew that she had taken DES. When Ann read that article she did not know and her mother did not know that Mrs. O'Brien had taken DES. Second, the total pathology causing Marilyn Malloy's death was far worse than that of Ann's. Marilyn had suffered from nausea, severe headaches, the cancer reached the pituitary glands, she had had six weeks of "whole head" radiation, all of her hair had fallen out, at night she was moaning in pain, the cancer had spread to her arms, legs, spine and brain and ultimately she was blind and confined to a wheelchair. Certainly a jury could conclude that someone untrained in medicine and with no expertise in the etiology of cancer would not have been put on notice that her condition, (though tragic but not nearly as bad as Marilyn Malloy's), was so analogous to Marilyn Malloy's that it was caused by her mother taking DES.

Patients have always been told to "go to your doctor" for advice, but the majority has now imposed a different standard, which is "disregard your mother and disregard your doctor but go to Newsweek" to learn the etiology of your condition. After reading the Newsweek article Ann went to her physician and asked him whether her condition was DES-related. She pressed him to learn whether she in fact had had cancer and learned for the first time that she had been operated on in 1971 for vaginal cancer and that her physician and her parents had withheld this information from her. She then asked Dr. Mikuta the critical question, was her cancer caused by DES? The trial court found from its analysis of Dr. Mikuta's equivocal statement that "Dr. Mikuta also stated that he was *unsure of the cause* of the plaintiff's" cancer. App. at A–93 (emphasis added). Ann then went to her mother and asked her whether she had ever taken DES. Her mother responded, just as she continued to up until 1979, that she had not taken DES.

Under these facts what more should have been expected from a teenager who had just learned that she had had cancer? For some unfathomable reason the majority concludes that it was unreasonable for Ann not to have found out in 1976 that her mother had taken DES.

## IV.

More than three decades ago when speaking in a somewhat different context, Mr. Justice Frankfurter stressed that there was

torture of mind as well as body; the will is as much affected by fear as by force. And there comes a point where this Court should not be ignorant as judges of what we know as men.

*Watts v. State of Indiana*, 338 U.S. 49, 52 (1949). Certainly any teenager who learns for the first time that she had had cancer, sustains a torture of the mind. To fail to comprehend that torture is to "be ignorant as judges of what we know as men [or as persons]."

Cancer is the second leading cause of death in the United States. See American Cancer Society, "Cancer 1981, Facts and Figures," p. 7. It is estimated that in 1981, 420,000 Americans will die of cancer and there will be 815,000 new cancer cases in 1981 for persons residing in the United States. *Id.* at 8. The cancer will range in sites from the buccal cavity and pharynx to the digestive organs, respiratory system, bone, tissue and skin, breasts, genital organs, urinary organs, eye, brain and central nervous system, endocrine glands, blood (leukemia) and other lymph tissues. *Id.* at 8. The sites of cancer are many, and many of the causes of cancer are still an enigma to even the most distinguished oncologists. Every layman knows that the riddle of cancer has not been solved and that its causes are uncertain. Yet, the majority seems to suggest that a nineteen year old who learns that she has suffered this dreaded disease must now be able to ascertain its etiology even when her surgeon, a professor of obstetrics and gynecology, is unsure of its cause. Is the majority suggesting that patients who suffer this dreaded disease must now be able to ascertain its etiology even when oncologists are "unsure" of the cause?

If we should "not be ignorant as judges of what we know" as men and women, what was the trial court's view of the normal relationship between mother and daughter? Presumably mothers and daughters do not have the inherent antagonism and suspicion which world superpowers might have when negotiating at a bargaining table on disarmament. Wasn't it reasonable for a daughter to believe that her mother spoke the truth when she said in 1976 that she had never taken DES? We know that on this record a jury could conclude that in 1976, 1977 and 1978 the mother believed sincerely that she had never taken DES. Yet the majority suggests that a Newsweek article should have caused Ann to disbelieve her mother and probably her surgeon; that such disbelief was the only rational option on the facts of this case; thereafter Ann should have on her own embarked on an investigation to ascertain the etiology of her cancer.

Why is it that a teenager should have pursued such a pharmacological inquiry?—according to the majority it is solely because by chance she had read a 6-paragraph article in Newsweek. Thus one must ask what standing, if any, does Newsweek have as an authoritative standard reference work, a learned treatise or a scientific, pharmacological or medical journal? It certainly does not fit within the definition under the Federal Rules of Evidence of a learned treatise. See Fed.R.Evid. 803(18). The Newsweek article was not written by anyone purporting to be a physician, nurse or scientist, and a jury certainly could find that it is not an authoritative journal of medicine or a learned treatise within the meaning of Rule 803(18). There is a cruel irony in the majority's ruling. The very Newsweek article which they rely on as compelling a teenager to conduct an investigation would never be admitted into evidence if one were attempting to prove that DES causes cancer. It would not have the inherent trustworthiness of a standard reference work or a learned treatise. Yet to

the detriment of a person untrained in medicine or law, today the majority rules that an article which would otherwise be inadmissible on the causation issue should be given a weight and credibility which even the Federal Rules of Evidence do not recognize.[1] While Newsweek is an interesting weekly journal, it has no more standing in medicine or oncology than a fortuneteller's forecast. It should have no more authority in the field of medicine than a one page flyer randomly distributed in the street has in the fields of nuclear energy or astronomy.

The trial court recognized that conflicting inferences were possible. But it then exceeded the proper bounds of the court's function when deciding summary judgment by deciding which of those inferences was to apply. A reasonable jury could have concluded that, in *insisting* in 1979 that her mother double-check her recollection, Ann made *extraordinary* efforts; that, in fact, she discovered that her mother had taken DES only through the exercise of due diligence. The majority's conclusion effectively penalizes her, at least in terms of her right to a trial, for the efforts she made in 1979.

The majority concedes "that this is a close case." By the very fact that it recognizes the closeness of the issues it should have been reluctant to approve a summary judgment dismissal. Granting summary judgments in close cases can cause gross injustices and adds a perhaps uncontemplated dimension to Justice Holmes' remark that "hard cases make bad law." *Northern Securities Company v. United States*, 193 U.S. 197, 400, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904) (Holmes, J., dissenting).

## V.

In our own circuit, *see, e.g., Bayless*, 579 F.2d 37; *Goodman*, 534 F.2d 566; *Hanna*, 514 F.2d 1091; *Wetzel*, 491 F.Supp. 1288, and *Hoeflich*, 288 F.Supp. 659, and in other circuits summary judgment has been denied in analogous circumstances. The Second Circuit Court of Appeals, citing numerous cases from its own and other circuits, held in *Robertson v. Seidman & Seidman*, 609 F.2d 583 (2d Cir. 1979) that a shareholder of a defunct corporation could not be barred by the statute of limitations from bringing an action against an accounting firm for alleged securities violations when conflicting inferences could be drawn from the facts.[2]

In other cases involving analogous, but far less compelling circumstances than Ann's, the Fourth, Ninth and Tenth Circuits have also denied summary judgment. The Fourth Circuit Court of Appeals held that

1. I have searched diligently to find any case in the history of American jurisprudence which has ever recognized a newspaper or general magazine as a learned treatise, and I have found none. As Professor Wigmore notes, the exception which permits the admission of a learned treatise "... is usually spoken of as involving the use of 'scientific books' or 'medical books' or 'books of science and art.'" 6 Wigmore on Evidence § 1690, at 2 (1976). Would anyone call a weekly news magazine a book of science and art?

2. The critical question in the instant case is when did appellant actually know, or in the exercise of due diligence should have known, of the fraudulent activities of Seidman & Seidman. As we held in [*Friedman v. Meyers*, 482 F.2d 435 (2d Cir. 1973)], ..
   "[I]ssues are raised as to the state of mind, intent and knowledge of the parties. We have repeatedly stated that summary judgment is particularly inappropriate where, as here, it is sought on the basis of 'the inferenc-

es which the parties seek to have drawn [as to] questions of motive, intent, and subjective feelings and reactions.'" 482 F.2d at 439.

Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case—similar to the type of inferences that must be drawn in determining intent and good faith.... When conflicting inferences can be drawn from the facts, ..., summary judgment is inappropriate....

In the instant case, it not only is possible to draw, but the parties indeed do draw, conflicting inferences from the various factors relied on by the district court. Granted that the district court's conclusion that appellant should have discovered the fraudulent activities of Seidman & Seidman before July 6, 1975 is plausible, a contrary conclusion also may be reached.

*Id.* at 591 (citations omitted).

summary judgment on a statute of limitations was precluded in *Johns Hopkins University v. Hutton*, 422 F.2d 1124 (4th Cir. 1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974) (an action to rescind the purchase of an oil and gas production payment), because the question of when the plaintiff could have discovered with reasonable diligence that the defendants had misrepresented future earnings presented a genuine issue of material fact.[3]

Similarly the Ninth Circuit has held that when a "reasonably prudent person" should have made certain discoveries should not be decided as a matter of law on summary disposition. Just as the trial court in this case decided that the impact on Ms. O'Brien of articles about DES-related cancer which she read in 1979 was no different than that of the 1976 Newsweek article, the trial court in *Briskin v. Ernst & Ernst*, 589 F.2d 1363 (9th Cir. 1978) concluded that certain documents should have triggered "discovery" by the plaintiffs in that case, despite plaintiffs' denial that the documents had such an effect. In reversing the district court's grant of summary judgment based on limitations, the court of appeals in *Briskin* stated that issues requiring conclusions about the actions and knowledge of a reasonably prudent person in particular circumstances "calls for a review of the documents in question by a trier of fact in light of all the evidence. A trial judge should not assign conclusive legal effect to such documents at the summary-judgment stage when there can be a genuine difference of opinion as to their impact on a reasonable person." *Id.* at 1368.

Different "ultimate inferences" also precluded summary judgment based on limitations in *Exnicious v. United States*, 563 F.2d 418 (10th Cir. 1977), a case involving a medical malpractice claim under the Federal Tort Claims Act. The trial court in *Exnicious* was held in error because in finding that the plaintiff's post-surgical diagnosis of traumatic arthritis gave the plaintiff actual knowledge or reason to know his injury, its cause, and the causative relationship between the two, "the court rejected other reasonable inferences and decided a disputed fact issue." *Id.* at 424, citing *Hanna v. United States Veterans' Administration Hospital*, 514 F.2d 1092, 1095 (3d Cir. 1975).

I do not believe that there were present in any of the cases just discussed, or in any of those cited from our own circuit, conflicting inferences any more plausible than those now before us. No doubt the district court's conclusion that the statute of limitations began to run in 1976 because Ann, with due diligence, reasonably could have discovered in 1976 what she discovered in 1979, is plausible. But because it is just as plausible for a jury to conclude otherwise, the district court's summary disposition, involving as it did resolution of disputed factual inferences, was inappropriate.[4]

---

**3.** On summary judgment we must view the inferences pertaining to ... diligence in the light most favorable to ... the party opposing the motion. Since inferences contrary to those drawn by the district judge might be permissible, a genuine issue of fact was raised that should have been submitted to the jury.

    .   .   .   .   .

It is sufficient for us to say that when, as here, a jury has been demanded and the facts give rise to conflicting inferences on the issue of reasonable diligence, the question must be submitted to the jury.
*Id.* at 1131 (citations omitted).

**4.** From my view Judge Sloviter's concurring opinion misconstrues the issue. Of course from the day when Mrs. O'Brien first took a pill, "it was knowable" that it was DES. The issue here is what is it that Ann O'Brien should have been expected to do in 1976. The majority's hypothesis repudiates the tenets of basic pedagogy. Often it requires the repetition of new or startling ideas before their significance is fully appreciated. Ann testified that from 1976 to 1979 she was not aware of "any DES group or DES daughters action group in Washington" where she was attending college. She testified that she did not become aware of them until August or September, 1979, when "there seemed to be quite a few articles on DES in the *Post* and magazines. And I just had read quite and read and it just seemed like things were really showing up in publications. And I was reading more about it." App. at 153. Certainly a jury could conclude that she should not have been required to make further inquiry as to whether her mother had taken DES until August or September 1979 when she read additional publications corroborating the inferences of the *Newsweek* article.

I do not suggest that summary judgment on the basis of a statute of limitations triggered by the "discovery rule" is always inappropriate. I merely assert that when it is not clearly established that no genuine issue of material fact exists, as in this "close case," summary judgment should be denied. 6 Moore's, Vol. 2, ¶ 56.17[58], at 1062–63. (2d ed. 1980).

## CONCLUSION

Having been a trial judge for more than thirteen years, I am keenly aware of the inordinate pressure which trial judges have in trying to dispose of their heavy caseloads efficiently and fairly. But summary judgments were never intended to decrease basic fairness for litigants in order to increase a court's pace in the disposition of cases.[5] From my view Ann O'Brien has already suffered the tragedy of cancer; her plight should not have been compounded by depriving her of the opportunity to present her case to the jury. I dissent because there is a genuine disputed and material issue of fact as to whether she was sufficiently diligent in ascertaining the etiology of her cancer. Under the facts of this case, a rational jury could find that there was no lack of diligence when a teenager accepted as true the statements of her mother and surgeon.[6]

The majority has taken it upon itself to decide that the impact of the 1976 Newsweek article on a reasonable person had to have been the same as the cumulative impact in 1979 of reading additional articles on DES. Whether one article in 1976 or several articles in 1979 provided sufficient knowledge to trigger the duty of due diligence is a disputed question for the jury and should not be decided as a matter of law in a summary disposition.

**5.** I believe that this case exemplifies a disturbing tendency of a few judges in this circuit to grant summary judgment too freely in "close cases" involving complex product liability matters.

**6.** A jury could find that Dr. Mikuta's statement was true when he said that he was "not sure" of the cause of her cancer, and that it was reasonable for her to believe that aspect of his statement without considering his other comment on DES.